286 So.2d 914

**Sherrel Dean SPEEGLE**

·v.

**STATE.**

**6 Div. 505.**

Court of Criminal Appeals of Alabama.

Dec. 4, 1973.

Benjamin E. Pool, Montgomery, for appellant.

William J. Baxley, Atty. Gen., and Donald G. Valeska, II, Asst. Atty. Gen., for the State.

CLARK, Supernumerary Circuit Judge.

This is an appeal from a judgment of the Circuit Court of Cullman County adjudging appellant-defendant guilty of arson in the first degree and sentencing him " . . . to life in the penitentiary of the State of Alabama as punishment . . . ." The judgment was duly rendered and the sentence imposed by the court after a jury had found appellant-defendant guilty as charged in a three-count indictment, to which he had pleaded not guilty and not guilty by reason of insanity. In each of the three counts there was included an averment that the arson produced the death of J. B. Buckelew. Title 14, § 23 of the Code of Alabama provides that if arson in the first degree "shall produce the death or maiming of any person, the punishment shall be death or imprisonment in the penitentiary for life, at the discretion of the jury." The appeal encompasses a ruling of the trial court overruling a motion for new trial duly filed and presented by appellant-defendant.

The chief contention of appellant is that the evidence was insufficient to support a conviction and that the trial court erred in overruling the motion for a new trial, which was largely grounded on averments to the effect that the verdict was contrary to the evidence and contrary to the great weight and preponderance of the evidence.

On the night before Christmas, 1970, at approximately 10:30 P.M. the Blue and Gray Hotel in Hanceville, Alabama, was destroyed by fire. The evidence shows without dispute that J. B. Buckelew, a guest or tenant of the hotel, died as a result of smoke inhalation and carbon monoxide poisoning produced by the fire.

The evidence shows also without dispute that prior to the night of the fire appellant had been living in Birmingham, Alabama; early that night he took a bus from Birmingham to Cullman to visit his family; his mother and brother lived in Cullman; he and his wife, Evalene Speegle, had separated; they had two children; Mrs. Speegle and the two children were residing at the Blue and Gray Hotel in Hanceville.

According to the testimony of Michael Tubbs, a nephew of appellant, appellant

requested Michael to drive appellant from his mother's home to a local gas station at which appellant purchased some gasoline; gasoline was placed in two plastic gallon jugs; appellant then requested Michael Tubbs to drive him to Hanceville, but Mr. Tubbs refused. Mr. Tubbs drove appellant to a store where appellant procured two brown paper bags. Then Mr. Tubbs drove appellant back to within a half block of where appellant's mother lived, where appellant parted company with Mr. Tubbs and removed from the automobile the two plastic gallon jugs containing the gasoline he purchased at the gas station.

R. L. Willoughby, Cullman police officer, testified that on the night of the fire between 8:30 and 9:30 o'clock he saw appellant get out of an automobile and walk toward his mother's house; that appellant had in his hands "a paper sack, he had two paper sacks, or one large paper sack, it looked like two paper sacks." On cross-examination he stated, "I didn't know what he had in his hand. The only thing he had was a paper bag.", that it was "brown looking, like a brown paper sack."

Sherman Hanners, a cab driver, testified that on the night of the fire appellant called for a cab in Cullman to come take appellant on a short trip. Mr. Hanners picked appellant up at the home of appellant's mother; appellant had a brown paper bag under each arm. He had some clothes in his left hand; appellant placed one of the bags in the back seat of the automobile and the other one between his legs; they stopped at a trailer; appellant went to the trailer and returned with a bottle in his hand. The two bags had been left by him in the cab while he went to the trailer. Upon appellant's return to the cab, they proceeded to Hanceville and, at the direction of appellant, to the northwest side of the hotel, where Hanners parked the cab in the alley. Appellant told Hanners to "wait and see if he could get a room." Appellant got out of the cab, reached back and took the paper sack or bag that was sitting on the floorboard be-

tween his feet and went in the direction of the front of the hotel. When appellant reached the end of the steps at the front of the hotel, he turned and went up the steps and was gone approximately five minutes, and when Hanners next saw appellant, appellant was at the right front fender of the cab, at which time he did not have a paper sack in his hand; appellant was walking fast and appeared to be normal; he got back in the cab and said, "Let's go"; Hanners then took him back to his mother's. Hanners did not smell any gas. He did not hear any noise of any kind or any unusual sound while appellant was gone from his cab at the hotel. He did not smell any smoke or hear any glass breaking. He returned appellant to his mother's at about ten or fifteen minutes until eleven o'clock. The bag that appellant took out of the car, according to Hanners, "was full of something, it looked like it was something solid, it wasn't mashing in, it wasn't mashed in when he got out, it wasn't mashed in." According to Hanners, he did not know what it was but it was "something more solid than clothes."

By the testimony of Herman Parrish, owner of the Blue and Gray Hotel, who was at the hotel at the time of the fire, it was shown that both J. B. Buckelew, the deceased, and Mrs. Speegle, appellant's wife, were tenants of the hotel; that Mrs. Speegle resided in room 201 of the hotel, which room was on the second floor of the hotel and adjacent to the top of the stairs from the first floor to the second floor. He testified that he was in the lobby when he heard "some kind of a racket that broke upstairs"; he ran upstairs and found a "mighty bad fire" in room 201; the door of the room was slightly ajar; the whole room was full of fire; he saw no fire anywhere else; after having run upstairs and run back downstairs he proceeded to rescue the tenants. The fire spread rapidly and the building was in flame and the walls falling within five minutes, according to Mr. Parrish. The hotel was heated by steam. There was a central unit in the

basement, an automatic gas furnace that generated steam that went through pipes through radiators all over the building. Hot water for the rooms was provided by a gas heater in the basement; "there was no fire in any of the rooms with reference to the heating." Upon being interrogated as to whether there could have been hot-plates and electric heaters in the rooms, he answered, "I had never heard of one, I don't think so."

Mrs. Speegle, the wife of appellant, testified that she was not at the hotel the night of the fire; all of her clothes and the clothes of her children were destroyed by the fire; the only heating device in her room was the steam radiator; she had no gas heater in her room of any kind; there was no electrical equipment in the room other than the lights. She testified that he husband had told her " . . . if I didn't come back home, I wouldn't have anything to come back to. He would burn it up, so I told him I wouldn't come back." She and her husband had been having trouble for some time and had been separated on other occasions.

Steve Milligan, fifteen years of age the Sunday after his testimony was given, testified that he saw defendant, whom he well knew, run down stairs; about that time he heard a noise that sounded like glass being broken and a loud explosion; the noise sound like it was in Mrs. Speegle's room; he was approximately six feet from the appellant when he saw the appellant. He and his mother and three other children lived in three rooms, one of which was underneath the room rented to Mrs. Speegle. Mr. Parrish, the owner of the hotel, had left the lobby just before Steve saw Mr. Speegle. Steve's mother came out of the room after the noise and asked what had happened; he told her and they both ran to the door to see if they could see defendant.

Mrs. Edna Cook, mother of Steve Milligan, testified that she had returned to the hotel and was preparing to go to bed and

to get the children to bed and that as she walked into her room a car pulled up at the side of her window and parked; she heard a noise upstairs that sounded like glass breaking and "kind of like a boom"; she ran back out into the lobby and met Stephen and asked him what happened; she then ran out the door to the front porch of the hotel and saw a car pull out from the side of the hotel and turn north on 31 Highway.

Defendant testified at length. He denied starting the fire or having any connection whatever with the fire. He said he worked on his job in Birmingham from 7:00 A.M. to 2:00 P.M. on December 24, went to the bus station and boarded a bus to Cullman at about 6:30, arriving at Cullman about 8:00. He stated his wife was supposed to pick him up and they were supposed to go shopping and that she was not there; that he called the Blue and Gray Hotel and they said she was not there; he bought a return ticket to Birmingham; he made a change in his plans and went to his mother's by taxicab. Michael Tubbs came and picked him up at his mother's and took him to the home of defendant's brother-in-law, Mr. Vickery, where they had a few drinks; he had had several beers in Birmingham and had bought a fifth of whiskey in Birmingham; he stayed at Vickery's about thirty minutes or an hour; he then left with Michael Tubbs and Michael's girl friend and went to a service station in Cullman, and bought some gasoline to go in plastic milk containers, gallon containers. He said he was getting the gasoline to carry down to his farm to get the car started. The containers were approximately half filled by him to keep the gasoline from spilling. Thereafter he and Michael and Michael's girl friend went to a store where he bought some paper sacks; and he put the containers of gasoline in the sacks, one container in each sack; after being driven a short distance he got out of the car and went to his mother's where he had another fifth concealed and took a drink. He said he left the gasoline sitting on the

northeast side of his mother's house and then called the cab company and talked with Sherman Hanners, asked him to carry him to Hanceville and to take him to get some whiskey, because he was about to run out. Hanners responded to the call and appellant boarded the taxi taking with him some clothes that he had obtained for the children in Birmingham that afternoon. The clothes were in a large bag. He had two bags, one containing his clothes and one containing the children's articles consisting of shoes, pants, a shirt and a dress. He placed one in the front and the other in the back. One "bag" was described by him as an "Arkansas suit case, a shopping bag with a handle on it" and the other as a large shopping bag. Neither was a bag that he had obtained at the store and in which he had placed the containers of gasoline. After obtaining some more whiskey and drinking some of it, he told Mr. Hanners to drive him to Hanceville. They went around behind the hotel and parked on the northeast corner of the hotel facing 31 Highway. He told Mr. Hanners to wait a few minutes, that he would only be a minute. He took the bag containing the clothes for the children and went to his wife's room; when he reached the top of the stairs on the second floor, he turned right, pushed the door open and flipped the light on and laid the bag on the bed, turned around and left. He did not stay there over a minute or two minutes; he saw no one while going into the hotel or leaving it; he saw no fire while on the second floor. He walked down the stairs and out the front door; walked out and got in the cab and left after telling Mr. Hanners that he was ready to go. Mr. Hanners transported him to his mother's home; thereafter he went to his brother's home and spent the night. His sister and her husband took him to the home of appellant's brother; he took with him the two cartons of gasoline, his clothes and his whiskey. He carried the gasoline to his car, where he banged his leg on the bumper, lost his temper, went in the house and had a couple of drinks.

On cross-examination defendant was asked, "Why did you take your clothes from your mother's on this trip and go right back to your mother's in this bag?" He answered, "Well, a drinking man does a lot of things that can't be explained, that is the only answer I have to it." Further on cross-examination he testified that he made a statement when he was arrested that he had not been in Hanceville the night of the fire. Upon being questioned as to how he knew his car was out of gas down at his brother's house, he said he had worked on it four or five times during a period of almost two months in November and December, that "I knew it wouldn't run, but I had worked on it and I was anticipating that it was ready to crank up except for being out of gas."

■ Strongly insisting that the evidence is insufficient or too weak to support the judgment and the action of the trial court in overruling the motion for a new trial, appellant lays great store upon the principle that burning by accident and natural causes must be satisfactorily excluded to justify a conviction of the crime of arson. Street v. State, 39 Ala.App. 190, 96 So.2d 680; Lowery v. State, 38 Ala.App. 505, 88 So.2d 854; Carr v. State, 16 Ala.App. 176, 76 So. 413. The principle stated is a corollary of the proposition that proof of the corpus delicti is required. Often quoted is the statement found in Winslow v. State, 76 Ala. 42:

"In arson, the corpus delicti consists, not alone of a building burned, but also of its having been willfully fired by some responsible person. Burning by accidental and natural causes must be satisfactorily excluded, to constitute sufficient proof of a crime committed."

To sustain a conviction, there is no requirement that evidence as to the corpus delicti be isolated from evidence pointing to participation by defendant.

"The facts and circumstances which tend to prove the corpus delicti are often in-

terwoven and considered with those which connect accused with the crime." 6 C.J.S. Arson § 38, p. *762.*"

The point is emphasized that the evidence in the case was circumstantial only. If direct evidence were essential, almost all arsonists would escape conviction. Furtiveness is almost always a concomitant to arson.

" . . . . The burning usually occurs in the darkness of night, when the incendiary feels assured that there is no human eye who may see his hand apply the brand, and no human ear to hear the fall of his footsteps, as he stealthily approaches and retreats from the place of his criminality. Rarely has it happened that an eyewitness to the crime of arson could be produced. The prosecution in such cases must depend, generally, on circumstantial evidence. That evidence is necessarily often of a negative character; that is, the criminal agency is shown by the absence of circumstances, conditions, and surroundings indicating that the fire resulted from an accidental cause." State v. Edwards, 173 S.C. 161, 175 S.E. 277 (1934).

■ We think the evidence was strong as to the corpus delicti and as to the guilt of defendant. Pointing to the first is the circumstance that the fire started suddenly and with tremendous violence in a room in which there was no fire-making equipment. Pointing to both, according to substantial evidence, are the circumstances, among others, that (1) defendant entered and left the room not more than about five minutes before the fire started in the room, (2) defendant took to the room and left in the room a carton containing gasoline, and (3) defendant had previously threatened to burn the home of his wife, who resided in the room in which the fire commenced. As bizarre as are the circumstances as a whole, testimony of any one of the several witnesses against defendant is hardly less credible than his own testimony. But whether this conclusion is correct or not, it is clear that a jury issue as to defendant's guilt was presented and that the trial court did not abuse the discretion vested in it in overruling the motion for a new trial. A trial court's ruling on granting or denying a motion for new trial is not to be reversed in the absence of an abuse of discretion. Nickerson v. State, 283 Ala. 387, 217 So.2d 536; Nichols v. State, 267 Ala. 217, 100 So.2d 750.

■ As noted in the first paragraph of this opinion, defendant was "sentenced to life in the penitentiary of the State of Alabama as punishment." The language quoted is taken from the record of the judgment entry, which also shows that the jury returned a verdict "We, the jury find the defendant guilty as charged and fix the punishment at imprisonment in the penitentiary for life." Although it seems probable that failure of the record of the sentence to provide for "life imprisonment in the penitentiary" or "imprisonment in the penitentiary for life" or language to that effect, instead of "life in the penitentiary," constitutes a mere misprision, we deem it appropriate to invite attention of all concerned to such textual discrepancy. It furnishes no basis for a reversal.

We have considered all of the insistences upon error in the brief of counsel for appellant, as well as the entire record as provided by Title 15, § 389, Code of Alabama 1940, and conclude that there is no prejudicial error therein and that the judgment of the trial court should be affirmed.

The foregoing opinion was prepared by Leigh M. Clark, Circuit Judge, temporarily on duty on the court pursuant to subsection (4) of Section 38, Title 13, Code 1940, as amended; the court has adopted his opinion as its own.

Affirmed.

All the Judges concur.