405 So.2d 1 (1981)
Bill L. CHAVERS and Diana Z. Chavers
v.
NATIONAL SECURITY FIRE & CASUALTY CO.
79-280.
Supreme Court of Alabama.
On Application for Rehearing October 2, 1981.
*3 Benjamin H. Kilborn, James H. Griggs, Frank Grey Redditt, Jr., of Kilborn & Redditt, Mobile, for appellants.
Alton R. Brown, Jr., Don O. White and E. J. Saad, of Brown, Hudgens, Richardson, Whitfield & Gillion, Mobile, for appellee.
Ira L. Burleson, Ralph B. Tate and Ollie L. Blan, Jr., of Spain, Gillon, Riley, Tate & Etheredge, Birmingham, for amici curiae Liberty Nat. Life Ins. Co. and Liberty Nat. Fire Ins. Co.
John W. Haley and Francis H. Hare, Jr., of Hare, Wynn, Newell & Newton, Birmingham, for amicus curiae Alabama Trial Lawyers Ass'n.

On Application for Rehearing
PER CURIAM.
The opinion issued by this Court on April 10, 1981, is withdrawn and the following opinion is substituted in its place:
This is an appeal from an order and an entry of judgment in the Circuit Court of Mobile County, granting defendant, National Security Fire & Casualty Company, a judgment notwithstanding the verdict or a conditional new trial. We reverse the JNOV and affirm the judgment granting the new trial.
On November 17, 1975, a fire destroyed a building which was owned by plaintiffs, Mr. and Mrs. Bill Chavers, in Mobile. At the time, a night club was being operated on the premises by the Chaverses' tenant, Mrs. Augsten, who was also purchasing certain fixtures in the building from the Chaverses. Defendant, National Security, insured the fixtures in Mrs. Augsten's name with the Chaverses named as the beneficiaries of the standard mortgagee's loss payable clause. The insurance was acquired pursuant to the security agreement between Mrs. Augsten *4 and the Chaverses which required Mrs. Augsten to insure the fixtures at an amount at least equal to the unpaid purchase price.
After investigations, both the fire marshal and the adjuster for National Security concluded that the cause of the fire was arson, but neither of their reports implicated Mrs. Augsten or the Chaverses. A pretrial deposition of an adjuster for another company insuring the same property indicated similar results. National Security's adjuster verified the coverage and assessed the loss at $15,409.64. The unpaid purchase price of the fixtures was $13,693.77, but defendant offered only $8,000.00 as settlement.
In early March of 1976 after defendant's continued refusal to respond to plaintiffs' demands for payment, plaintiffs filed suit. National Security based its refusal to pay on information received from Reed Eden, Mrs. Augsten's exboyfriend. Eden, who was on his way to the federal penitentiary, sought a reward for divulging information implicating Mrs. Augsten in the arson. In a recorded statement that was later submitted to a stress analysis test, Eden stated that Mrs. Augsten had told him that she and Chavers had discussed burning the building. The results of the stress test indicated that Eden was probably telling the truth. Other evidence, however, indicated that Mrs. Augsten's partner, Hazel Andress, had turned Eden in to the FBI, and that Eden had threatened to get even with her because of the tip. Although further investigation was recommended, none occurred. Both Mrs. Augsten and the Chaverses were in financial difficulty immediately prior to the fire.
The suit on the insurance claim resulted in a judgment for the Chaverses in the amount of $13,693.77, plus interest from the date of the fire. On April 1, 1977, the Chaverses filed suit against National Security alleging bad faith failure to settle the claim. National Security answered and the case went to trial. At the conclusion of plaintiff's case and again at the close of the entire case, National Security's motions for directed verdict were denied. Judgment was entered for the Chaverses on a jury verdict of $42,500.00. National Security then filed a motion for judgment notwithstanding the verdict or in the alternative for a new trial. The motion for judgment notwithstanding the verdict was granted together with a conditional new trial and judgment was entered for National Security. The Chaverses appeal.
Three issues are presented for review in this case. First, we must determine whether this jurisdiction recognizes a cause of action in tort for bad faith refusal of an insurer to pay its insured when a loss occurs within policy coverage. Second, if such a cause of action is recognized in Alabama, what is the requisite standard of proof? Finally, did the Chaverses prove a prima facie case?
In Childs v. Mississippi Valley Title Insurance Co., 359 So.2d 1146 (Ala.1978), we quoted with approval the following definition of the tort of bad faith:
Every contract contains an implied in law covenant of good faith and fair dealing; this covenant provides that neither party will interfere with the rights of the other to receive the benefits of the agreement. (Gruenberg v. Aetna Ins. Co., supra, 9 Cal.3d 566, 574, 108 Cal.Rptr. 480, 510 P.2d 1032; Comunale v. Traders & General Ins. Co., 50 Cal.2d 654, 658, 328 P.2d 198.) Breach of the covenant provides the injured party with a tort action for `bad faith' notwithstanding that the acts complained of may also constitute a breach of contract. (Crisci v. Security Ins. Co., supra, 66 Cal.2d 425, 430, 58 Cal.Rptr. 13, 426 P.2d 173; Fletcher v. Western National Life Ins. Co., supra, 10 Cal.App.3d 376, 401, 89 Cal.Rptr. 78.) * *" Jarchow v. Transamerica Title Insurance Co., 48 Cal.App.3d 917, 122 Cal.Rptr. 470 (1975).
However, as Justice Jones pointed out in his special concurrence in Vincent v. Blue Cross-Blue Shield of Alabama, 373 So.2d 1054 (Ala.1979), the term "covenant" is a misnomer because it connotes an action ex contractu as a remedy for breach rather *5 than an action ex delicto. More appropriately, therefore, this requirement of good faith and fair dealing should be characterized as a duty implied by law. The duty, however, is not one of due care. Accordingly, bad faith is the intentional failure by the insurer to perform this duty implied in law. Waters v. American Casualty Co. of Reading, Pa., 261 Ala. 252, 73 So.2d 524 (1953).
In third party actions involving liability coverage, however, this Court has consistently allowed recovery against the insurer in situations where the insurer wrongfully refuses, either negligently or intentionally, to settle the third party claim within policy limits and where, as a result, the insured incurs a judgment against him in an amount in excess of the policy. Childs v. Mississippi Valley Title Insurance Co.; Waters v. American Casualty Co. of Reading, Pa. In the third party context, therefore, counts based upon either negligence or bad faith are actionable. Furthermore, both counts may be joined in a single action with recovery proceeding from either. This is not to say, however, that a test for bad faith includes a negligence standard of conduct. In this jurisdiction negligence is not an element of bad faith.
The law applicable to first party actions involving a direct claim by the insured is not so well settled. Although this Court has neither accepted nor rejected the tort of bad faith in first party actions, Lavoie v. Aetna Life and Casualty Co., 374 So.2d 310 (Ala.1979), we have indicated an increasing willingness to recognize such a cause of action given the appropriate circumstances. Vincent v. Blue Cross-Blue Shield of Alabama; Childs v. Mississippi Valley Title Insurance Co. This seemingly open attitude concerning the propriety of bad faith in the first party context, however, has not been without qualification as expressed below:
Vincent and Childs expressly recognize that the facts in a particular case may be such as to warrant recovery under the theory herein advanced.... This is not to say, however, that this court will in fact recognize such a theory. It merely means that sufficient facts have not been presented in an actual case so as to genuinely pose the issue for our decision one way or the other.
Accordingly, it is the facts of an actual case which will breathe life into the legal theories now advanced....
Lavoie v. Aetna Life and Casualty Co.
While the status of the tort of bad faith in first party actions has never been decided by this Court, we have expressly rejected any cause of action based upon an insurer's negligence in handling direct claims. Calvert Fire Insurance Co. v. Green, 278 Ala. 673, 180 So.2d 269 (1965). Calvert Fire, a first party action, restricted the negligence cause of action made available by Waters, a third party action, to third party actions only. We reaffirm this position.
In Calvert Fire we stated the following rationale for the distinction between first party actions and third party actions:
... As to liability insurance, the company owes to the insured a duty independent of the contract not to injure him, and when, from its negligent failure or refusal to adjust a claim, or from fraud or other bad faith, he sustains damages other than damages covered by the insurance contract, then an action in tort would be appropriate. The contract here was to pay a loss covered under the policy. The insured is damaged by the failure to pay only in the sense that any creditor is damaged by the debtor's failure to pay a matured debt, but for this an action in tort will not lie since the remedy is on the contract. Its liability under ... the policy is to pay the amount of the loss in excess of the deductible amount....
Calvert Fire Insurance Co. v. Green, (quoting Leonard v. Fireman's Insurance Co. of Newark, N.J., 100 Ga.App. 434, 111 S.E.2d 773 (1959)).
Subsequent cases are evidence, however, that the seemingly broad public policy decision in Calvert Fire was not intended to be nearly so far reaching in its application as to contemplate an across-the-board rejection of any form of first party cause of action, whether it be founded on negligence or bad faith. There was no bad faith allegation *6 in Calvert Fire; therefore, the only issue before this Court was whether the negligence count was actionable under Alabama law. Although we held that it was not, we made no determination regarding the availability of a cause of action for bad faith under similar circumstances.
Today, appellants Chavers seek to have the intentional tort of bad faith recognized as a viable cause of action in first party cases. Heretofore, we have reserved any ruling on this tort, "necessarily await[ing] the factual context of a live litigated case for a more definitive statement of its elements and its application." Vincent v. Blue Cross-Blue Shield of Alabama (Jones, J., concurring).
The instant case went to trial on the theory of bad faith, the judge instructed the jury as to bad faith, and the jury returned a verdict for the plaintiff based upon a bad faith cause of action. The judge, however, in a conscientious attempt to glean and apply the law of Vincent, a plurality opinion, ruled that the Chaverses failed to prove a prima facie case and granted National Security's motion for judgment notwithstanding the verdict, or alternatively, a conditional new trial. Because the instant case falls squarely within the aforementioned context contemplated by Justice Jones and because the issue is now properly before us for determination, we recognize the intentional tort of bad faith in first party insurance actions.
We hold that the same policy considerations underlying the disallowance of a negligence standard of conduct in this context do not categorically proscribe a cause of action arising out of intentional misconduct by the insurer. To hold otherwise would render meaningless the long standing legal principle in this state which holds that every contract carries with it an implied in law duty of good faith and fair dealing. See World's Exposition Shows, Inc. v. B.P.O. Elks, No. 148, 237 Ala. 329, 186 So. 721 (1939). While freedom of contract must necessarily be preserved, the corresponding duty of good faith and fair dealing must similarly be preserved as an integral part of contractual relations. As Justice Jones reasoned in his special concurrence in Vincent, this good faith duty imposed not by the contract itself, but rather by law, should not be premised upon a negligence standard of conduct.
The reasonable expectations of parties to an insurance contract contemplate a broad range of freedom on the part of the insurer to evaluate claims submitted thereunder and to decline payment in nonmeritorious cases. The corresponding duty to use diligence in the review and prompt payment of meritorious claims is contractually bargained for and the law need not impose a further duty to enforce its negligent breach. Similarly, this freedom (and, perhaps, the duty) not to honor, and thus legally dispute, claims of questionable validity in accordance with the terms of the contract is effectively denied if the law imposes so high a duty of faithful performance as to pose a threat of increased risks in the event the dispute is ultimately resolved adversely to the insurer.
These public policy considerations, however, do not persuade me that the law imposes no duty of good faith performance.
Vincent v. Blue Cross-Blue Shield of Alabama. (Emphasis added.)
The dissent in Vincent, set out in pertinent part below, further reflects the inherent policy considerations mandating our recognition of a redressable tort for intentional breach of good faith.
Public policy favors the free exercise of rights arising from a contract by the parties to it.
However, this is not to say that an insurer may in bad faith breach his contract with impunity. The law will not allow an insurer to wilfully refuse to evaluate or honor a claim with the knowledge that the avowed purpose of the insurance contract was to protect the insured at his weakest and most perilous time of need.
*7 We next address the issue of what standard of proof an insured is required to meet in order to recover on a claim for bad faith. In so doing we adopt the test promulgated by the dissent in Vincent and hold that an actionable tort arises for an insurer's intentional refusal to settle a direct claim where there is either "(1) no lawful basis for the refusal coupled with actual knowledge of that fact or (2) intentional failure to determine whether or not there was any lawful basis for such refusal."
The elements of the tort of bad faith may be proved, as with other intentional torts, by circumstantial as well as direct evidence. Recoverable damages may include mental distress and economic loss. This tort, therefore, is distinguishable from the tort recognizing that outrageous conduct is actionable in Alabama. See American Road Service Company v. Inmon, 394 So.2d 361 (Ala.1980).
Did the Chaverses prove a prima facie case, requiring its submission to the jury under this test? We hold that they did, at least to a degree sufficient to avoid the fate of a directed verdict. Although National Security had some evidence that the fire was the result of arson, its evidence linking the Chaverses to it was extremely remote, and inadmissible. A standard mortgagee's loss payable clause, such as the one involved in the instant case, provides that the mortgage holder will be paid for loss regardless of what defenses the insurer may have against any other person. Therefore, in order for National Security to have lawfully denied the Chaverses' claim without subjecting itself to a suit for bad faith, it would have needed to possess admissible evidence implicating the mortgagees, the Chaverses, in the arson.
As previously set out in the statement of facts, however, National Security admittedly based its refusal to settle primarily upon the testimony of Reed Eden, a convicted felon serving time in the federal penitentiary at the time his information surfaced. Cross-examination of National Security's claims manager elicited the following:
Q Do you have any statement other than this convict who said anything remotely tying Mr. Chavers to burning this place down?
A No. Not a statement from any individual.

* * * * * *
Q You were putting an awful lot of eggs in this Reed Eden basket, weren't you?
A It was the only basket I had.
Q It was the only basket you had. And tell me how much you checked out his background other than you knew he was in the penitentiary.
A I didn't.
Eden's testimony, upon which National Security so heavily relied, was as follows:
Q What other discussion did you have with Jeanette or Hazel or Bill Shafers [sic] concerning the burning of the club?
A Well, I for, uh, well, now I've never discussed anything with Bill Shafers [sic] and Jeannette at the same time but I, I have knowed that Jeannette and Hazel and Bill Shafers [sic] has, has talked about it. Now I didn't say... I don't mean to say that they was... they were planning to burn it or anything else but Jeannette, ah, told me that that's what they was talkin' about ... but, but Bill she said Bill is just in as bad a shape as she was in and that they was gonna' try to work somethin' out together.... Far as myself just hearin' the conversation, no, but I know they set at the table and, uh, she tells me that, ...
Q Did she ever tell you that they were talking about burning the place?
A Yeah, she said that, uh, well, she didn't come right out and say that, uh, well, me and Shafers [sic] we all gone [sic] get together and burn the place, no, she didn't say that, but she said her and Bill Shafers [sic] got to get together because he was in bad shape and she was too.... [emphasis added]
*8 The preceding testimony, however, is clearly inadmissible hearsay evidence. While National Security would have been fully justified in relying upon Eden's testimony as a base from which to develop admissible evidence, it was not justified in putting all its eggs in the basket of inadmissible hearsay. National Security, therefore, in order to have shown a "lawful basis for refusal" needed only to have pursued Eden's testimony to the point of admissible evidence.
National Security did in fact have a stress analysis, a form of lie detector test, run on Eden's recorded statement. The results of the analysis indicated that Eden was probably telling the truth but the company running the test recommended a denial of the claim pending further investigation of Eden's story. At this point and without any further investigation, however, National Security, on advice of counsel, decided to deny the claim and defend a suit. We quote from the record on cross-examination of the insurer's claims manager:
Q And they recommended that it not be paid without further investigation, didn't they?
A Yes.
Q Tell this Court what further investigation was made.
A We could not get any kind of leads on any of these people that Jeanette Augsten referred to. We simply could not get any leads for further investigation.

* * * * * *
Q Well, you didn't take it any further did you?
A We did not develop anything new beyond that point.
Q Tell me what effort you made to find anything new.
A Of course, we questioned Reed and tried to get some information out of him. We took, of course, statements from Jeanette Augsten and nobody knew any names of any of these people that they referred to. The Fire Marshal didn't come up with any leads as to who burned it or any concrete evidence and we just simply had nowhere else to go.
Q That's right. You had any number of people who were mentioned who may have burned the place down so based on that and other factors you decided you wasn't going to pay Bill Chavers?
A I decided yes, on advice of my counsel after I talked with him, we decided it would be proper to let a Court and jury to decide if Bill Chavers was in fact involved in this, based on the evidence we had.
Furthermore, Eden never testified to either having a conversation with Chavers himself or overhearing a conversation between Mrs. Augsten and Chavers concerning having the building burned. To the contrary, Eden testified only that Mrs. Augsten had told him of similar conversations between herself and Chavers, rendering Eden's testimony hearsay on hearsay and not falling within any of the recognized exceptions to the hearsay rule.
National Security would have us recognize advice of counsel as an absolute defense under these circumstances. While advice of counsel, along with all the other relevant factors, may be considered by the trial judge in his determination whether the strongest tendencies of the evidence, if believed, make out a case for the jury on the "lawful basis for refusal" issue, it is not necessarily an absolute defense. Where, as here, the advice of insurer's counsel is not founded on professional evaluation of the credibility of admissable evidence, but instead is confined totally to inadmissible and unproved hearsay evidence, absent any ongoing investigation relative thereto, such advice cannot serve, as a matter of law, to insulate the insurer client from bad faith liability.
The record further indicates that the Chaverses were caused to liquidate assets at less than real value in order to escape economic ruin. National Security contends that the Chaverses' bad financial situation prior to the fire provided a motive *9 for their involvement in the arson. That motive was not a sufficient basis for denying this claim.
In view of the foregoing evidence we conclude that sufficient evidence existed to go to the jury based upon a bad faith cause of action. Moreover, we find that National Security's failure to follow through with an investigation presented sufficient evidence for submission to a jury on the alleged "intentional failure to determine whether or not there was any lawful basis for such refusal."
We cannot hold that, under these facts, the Chaverses failed to make out a prima facie case, as a matter of law. The trial court erred, therefore, in entering a judgment notwithstanding the verdict in favor of the insurer. A motion for judgment notwithstanding the verdict does not permit a trial judge to substitute his judgment for that of the jury on the facts, and will not allow the trial judge to exercise that discretion permitted him on a motion for new trial, i. e., to consider the demeanor of the witnesses and the credibility of the evidence. Rule 50(b), ARCP, and Hanson v. Couch, 360 So.2d 942 (Ala.1978). Furthermore, this Court's review of the grant of a JNOV compels us to view the evidence in the light most favorable to the party who secured the jury verdict. Hanson, supra.
The rule in this jurisdiction regarding the granting of a motion for new trial, however, is just the opposite. There, a very strong presumption of correctness is indulged in favor of the judgment, and the trial court has broad discretion to grant a new trial, and in doing so, is authorized to weigh the evidence. As this Court stated in Hubbard Bros. Const. Co., Inc. v. C. F. Halstead Const., Inc., 294 Ala. 688, 321 So.2d 169 (1975):
From the second Monday in May, 1820, when the Supreme Court of Alabama first met at the capital in Cahawba, to this present day perhaps no principles of Alabama law have been more uniformly settled or more frequently cited than those pronounced in Cobb v. Malone, 92 Ala. 630, 9 So. 738 (1891).
In that leading case, Justice Clopton wrote for the court, inter alia:
"... [D]ecisions granting new trials will not be reversed, unless the evidence plainly and palpably supports the verdict...."
The reason for the rule is clearly stated.
"[The trial judge] has heard and seen the witnesses testify, observed their tone and demeanor, and noticed their candor, or convenient failure of memory, to avoid impeachment, or for other improper purposes. The appellate court, possessing none of these aids and advantages, and receiving the evidence on paper only, is less qualified to determine what evidence is unworthy of belief, what weight should be given to that which has been rejected by the jury, and may give undue weight to the testimony of some of the witnesses...." [Emphasis supplied-Hubbard Bros.]
In civil cases, it is the duty of a trial judge to order a new trial when he believes that a jury verdict is unjust. In State v. Oliver, 288 Ala. 32, 256 So.2d 866 (1972), a civil condemnation case, this Court affirmed the granting of a new trial where the trial judge said in his order granting it:
This Court is of the opinion that a miscarriage of justice was done to this defendant in the trial of this case. The defendant attempted to represent himself and he did not know how to establish the value of the property taken. Only one qualified appraiser testified. He was employed by the State. He testified that in his opinion the property had a market value of $4,500 [which was the amount of the verdict returned by the jury]. There obviously was testimony available to the defendant which would have fixed the value at a higher figure."
Although the defendant did not offer any evidence of value higher than that offered by the state, this Court, upholding the order setting aside the verdict because the trial court believed it was unjust and unfair, said:
*10 It is apparent from the trial court's ruling that a new trial was granted because the trial judge was "... of the opinion that a miscarriage of justice was done to this defendant ...," and that the "verdict ... was unjust...." Our case law has established the proposition:
"... [I]f the trial court had a definite and well-considered opinion that the verdict failed to do justice between the parties, it had the right and was under duty to set it aside and grant a new trial."
We think this rule is peculiarly applicable in bad faith cases and allows the trial court a considerable and desirable means of control to see that injustice does not result.
But the rule is not inconsistent with the equally ancient rule that a case must go to the jury if there is evidence from which it may reasonably return a verdict in favor of the party against whom a motion for directed verdict is sought. Grubbs v. Long-Lewis Hardware Co., 285 Ala. 697, 235 So.2d 836 (1970). The new trial rule simply permits a trial judge to consider the evidence which was before the jury, weigh it in light of what he observes during the course of the trial, and allow another jury to pass on the case if he is convinced that the jury verdict returned is unjust. It does not, however, where there is some evidence to support the verdict, permit the trial judge to enter a JNOV in favor of the party opposing the verdict. A JNOV is never proper unless it would have been proper to grant a directed verdict in favor of the same party.
A majority of this Court, in one way or another, has indicated that, in a proper case, the Court would consider the adoption of the tort of bad faith refusal to honor a valid claim in an insurance contract context. Our cases also indicate that the remedy will be afforded in only extreme cases. The only point of disagreement among that majority is whether this case is sufficiently extreme on the facts to permit its submission to the jury. We hold that it is; or, stated another way, the strongest tendencies of the evidence, if believed, meet the prescribed test.
National Security testified that although its information connecting Mr. Chavers to the alleged arson was slight, and was based upon "double" hearsay evidence, nevertheless, it elected to refuse payment and to let a court decide the issue. The mere speculation that some defensive matter could possibly emerge at trial falls short of a reasonable expectation of adducing some evidence which, if believed, would furnish a reasonable inference legally justifying the insurer's refusal to pay the claim.
National Security contends that to allow this bad faith claim to be submitted to a jury exposes the insurer to tort liability for every decision to defend a contract claim. This is precisely what we are not saying. In the trial of a bad faith claim, it is incumbent upon the trial court, under appropriate requests (as in any other tort claim), to determine whether the inferences which may reasonably be drawn from the plaintiff's evidence, if believed, constitute the elements of the claim. If so, the case is one for submission to the jury. If not, the defendant's motion for directed verdict is due to be granted.
Alternatively, the insurer may file a declaratory judgment action; and if the pleadings and proof justify an adjudication of the existence of a justiciable controversy as to the legal basis for refusal of payment issueallowing the court to entertain that action whether or not the insurer prevails on the insurance contract claimsuch an adjudication would also establish a valid reason for its refusal to pay, thus avoiding liability on the bad faith tort claim.
Here, this was not done; therefore, we hold that the trial court correctly allowed the case to go to the jury, there being some evidence to support the plaintiffs' charge that the insurer had intentionally, and without a legal basis therefor, refused to honor a valid claim. The trial court is not subject to reversal, however, for setting aside the verdict and ordering a new trial *11 before another jury in the event this Court reversed the order granting a JNOV. Because we hold it was error to grant the JNOV, we reverse the judgment in that regard, and we affirm the conditional judgment granting a new trial.
We are mindful that the trial judge had very little guidance from this Court in trying this case. Hopefully, we have now by our opinion in this case, as well as in Gulf Atlantic Life Insurance Corp. v. Barnes, 405 So.2d 916 (Ala.1981), delineated the tort of bad faith requisites with sufficient clarity to be helpful.
ORIGINAL OPINION WITHDRAWN; OPINION SUBSTITUTED; APPLICATION FOR REHEARING GRANTED; AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
FAULKNER, JONES, SHORES, BEATTY and ADAMS, JJ., concur.
TORBERT, C. J., and MADDOX, ALMON and EMBRY, JJ., dissent.
TORBERT, Chief Justice (dissenting).
On the original deliverance of the majority opinion in this case, I dissented by separate opinion and now wish to reiterate my views since the majority has now withdrawn its opinion of April 10, 1981, and substituted another opinion. Originally, the majority set aside the trial court's entry of a judgment notwithstanding the verdict and ordered the trial court to enter judgment in accordance with the verdict of the jury in favor of the plaintiffs on their claim against the defendants for damages. The majority, in effect, held that there was sufficient evidence upon which the jury could have found that the defendant (the insurer) in bad faith refused to pay the amounts allegedly due plaintiffs as mortgagees under a standard mortgagee loss payable clause after the insured building was destroyed by fire.
As the author of the majority opinion in this Court's decision in the case of Lavoie v. Aetna Life and Casualty Co., 374 So.2d 310 (Ala.1979), I frankly never contemplated that facts such as are present in the instant case could ever "breathe life into the legal theories" as to this tort of bad faith. 374 So.2d at 312. I thought it was made very clear how this Court would view the elements and legal standards as we "necessarily await[ed] the factual context of a live litigated case for a more definitive statement of its elements and its application." Vincent v. Blue Cross-Blue Shield of Alabama, 373 So.2d 1054, 1065 (Ala.1979) (Jones, J., concurring specially). Justice Jones in his special concurring opinion in Vincent v. Blue Cross-Blue Shield of Alabama, articulated his view as to the public policy considerations of this "intentional tort of bad faith" by writing:
Before concluding the discussion of this first-party "good faith" duty, and the elements essential to its breach, I believe a further analysis of an added dimension of the public policy considerations ... will help explain the severity and rigidity of the test herein defined. The reasonable expectations of parties to an insurance contract contemplate a broad range of freedom on the part of the insurer to evaluate claims submitted thereunder and to decline payment in nonmeritorious cases. The corresponding duty to use diligence in the review and prompt payment of meritorious claims is contractually bargained for and the law need not impose a further duty to enforce its negligent breach. Similarly, this freedom (and, perhaps, the duty) not to honor, and thus legally dispute, claims of questionable validity in accordance with the terms of the contract is effectively denied if the law imposes so high a duty of faithful performance as to pose a threat of increased risks in the event the dispute is ultimately resolved adversely to the insurer.
These public policy considerations, however, do not persuade me that the law imposes no duty of good faith performance. Surely, the law cannot leave without a remedy unconscionable conduct which is calculated to inflict substantial injury upon another whose rights arise under the contract. The duty which I *12 would impose in these cases does not embrace the honest mistake in denying a claim, nor does it include the negligent delay or negligent refusal to honor a claim. Rather, it is an intentional tort, a species of fraud within Rule 9(b), ARCP.
In my opinion, the law imposes upon an insurer the duty not to willfully and maliciously, without legal justification, and with the intent to injure, refuse to evaluate or honor a claim, the breach of which, if proximately resulting in substantial injury, will sustain an action in tort. As in other intentional torts, its elements may be proved by circumstantial, as well as direct, evidence. "Substantial injury" means personal or economic injury of a significant nature as opposed to an injury of a nominal or insignificant nature. Recoverable damages may include, subject to the "substantial injury" test, mental distress and economic loss; and, when actual damages are proved, punitive damages may be awarded.
Vincent v. Blue Cross-Blue Shield of Alabama, 373 So.2d at 1064-5.
The majority in this case now proposes to adopt the test proposed by Justice Embry's dissenting opinion in Vincent v. Blue Cross-Blue Shield of Alabama. In his dissenting opinion, Justice Embry wrote:
Because of the nature of the test, it would be for the trial court to determine as a matter of law whether any lawful basis for the refusal existed. Should the court find a lawful basis for refusal existed, it would direct a verdict in favor of the insurer. Should the court find no lawful basis existed, it would be for the jury to determine whether the insurer had actual knowledge of its nonexistence. Whether the insurer intentionally failed to determine whether or not there existed a lawful basis for refusal would also be a question for the finder of fact. Under this test, an insurer would not be held liable for a mistaken but good faith belief that a lawful basis for refusal exists.
373 So.2d at 1068.
Even Justice Embry cannot agree with the majority opinion in this case. He dissents. If the standard set forth by Justice Embry in his dissent is the applicable standard, the judgment by the trial judge should be affirmed. As I understand the standards, before submission of a bad faith refusal case to the jury, the trial judge would conduct a preliminary examination to determine whether, as a matter of law, a lawful basis existed for denial of the claim by the insurer.
The trial judge, in his order in this case, concluded:
1. That the verdict and judgment entered in this cause in favor of the Plaintiffs is [sic] hereby set aside and judgment is entered in favor of the Defendant in accordance with the Defendant's Motion for Judgment Notwithstanding the Verdict. That the Court specifically grants the Defendant's Motion for Judgment Notwithstanding the Verdict based upon the first two grounds asserted in said Motion which are as follows:
1. Based upon the case of Vincent v. Blue Cross-Blue Shield, Inc., Ala., 373 So.2d 1054 (1979), the Plaintiffs have failed to prove a prima facie case against this Defendant.
2. Based upon the above cited case, a directed verdict for the Defendant should have been granted based upon the uncontroverted evidence that a reasonable basis for denying the Plaintiffs' original claim existed when same was denied by the Defendant.
2. That the Defendant's Motion for New trial is conditionally granted based solely upon the same grounds as assigned in Paragraph 1 above; so that in the event that the judgment hereby entered should be reversed on appeal, the new trial shall proceed unless the Appellate Court orders otherwise.
From the foregoing, it is manifest that the trial judge determined as a matter of law that a lawful basis existed for the insurer's denial of the claim. Under Justice Embry's test which the majority claims to adopt, it was entirely proper for the judge to enter J.N.O.V., because he found that plaintiffs had failed to make out a case sufficient to be submitted to the jury.
*13 Succinctly stated, the majority purports to adopt Justice Embry's test, but erroneously applies it; thus, I can only conclude that the majority, for some unexplained reason, is unwilling to accept the fact that this is not the appropriate case for this court "to breathe life into the legal theories" of this new tort, its elements, and available defenses. The facts of this case, from a legal standpoint, are not significantly different from the facts developed in Vincent v. Blue Cross-Blue Shield, supra, wherein this Court affirmed the trial court's granting of a summary judgment in favor of the insurer.
In order to find sufficient facts upon which a jury could lawfully conclude that the insurer was guilty of the tort of bad faith, the majority has determined that the defendant's failure "to follow through with an investigation presented sufficient evidence for submission to a jury on the alleged `intentional failure to determine whether or not there was any lawful basis for such refusal.'" The majority makes this determination in spite of the allegation in plaintiff's complaint that "the defendant caused a full and extensive investigation of said file to be made." As the appellee (insurer) appropriately points out in its brief on rehearing, the insureds recognize that there was no "intentional failure to determine whether or not there was any lawful basis for such refusal." The plaintiffs fail to assert theory of failure to investigate in their pleadings. They recognize this fact in their briefs. It is therefore clear that the issue of whether the insurer intentionally failed to investigate should not be before this Court. The majority errs by seizing upon a theory not formally pleaded, upon which the jury was not adequately instructed, and reaches a result in order to sustain the proposition that this case should have been submitted to the jury. Even under our liberal rules of pleading, this tort being a species of fraud (bad faith), some specificity must be required.
It is clear that the cause of the fire was arson. It would be a rare case indeed to have direct evidence as to the persons participating in such misconduct. The law recognizes this factor and permits a broad range of evidence to prove arson in defending a claim under fire insurance coverage. See, Washington v. State, 290 Ala. 344, 276 So.2d 587 (1973); Harris v. State, 358 So.2d 482 (Ala.Crim.App.), cert. denied, 358 So.2d 487 (Ala.1978); Speegle v. State, 51 Ala. App. 504, 286 So.2d 914 (1973). In discussing how the insurer could have lawfully denied the plaintiff's claim without subjecting itself to the tort of bad faith, the majority originally stated: "[I]t would have needed to possess credible, not conclusive, evidence implicating the mortgagees, the Chaverses in the arson." Now on rehearing the majority reexamines this statement of the law and now says that while the insurer "would have been fully justified in relying upon Eden's testimony as a base from which to develop admissible evidence, it was not justified in putting all its eggs in the basket of inadmissible hearsay." Simply put, this Court creates a standard too strict for practicable application in the business world of insurance by saying to insurers that it is not enough to investigate and interview a witness who was probably telling the truth as demonstrated by a lie detector test, but insurers had better be positive that a witness's testimony will be admissible in a subsequent trial.
But, the majority's analysis of the issue does not end here. They go further and say, regarding advice of counsel, that "the advice of insurer's counsel is not founded on professional evaluation of the credibility of admissible evidence ... [and] absent any ongoing investigation relative thereto, such advice cannot serve, as a matter of law, to insulate the insurer client from bad faith liability."
It is a well-settled rule in cases of this character, when malice or its equivalent may be involved, that if the defendant acted solely upon the advice of a reputable attorney, after fairly submitting to him all the facts, this will make out a complete case against malice or bad faith. [Citations omitted.]
Phillips v. Morrow, 210 Ala. 34, 97 So. 130 (1923).
*14 The majority, having now recognized the tort, by dictum gratuitously says:
Alternatively, the insurer may file a declaratory judgment action; and if the pleadings and proof justify an adjudication of the existence of a justiciable controversy as to the legal basis for refusal of payment issueallowing the court to entertain that action whether or not the insurer prevails on the insurance contract claimsuch an adjudication would also establish a valid reason for its refusal to pay, thus avoiding liability on the bad faith tort claim.
The practicality of the application of this legal proposition is fraught with difficulties and uncertainties. Does the majority mean that if a court in a declaratory judgment action makes a determination that the controversy is justiciable, then the insurer would escape tort liability even if the declaration was against the insurer? If this is the rule, the rule could encourage litigation, because it is probable that insurers would race to the courthouse to make out a case of justiciable controversy as to whether or not to defend a claim on an insurance policy; and, the insured would, in all likelihood, file a cross-claim on contract and on the tort of bad faith, or fraud, as we have seen in the case of Federated Guaranty Life Insurance Co. v. Bragg, 393 So.2d 1386 (Ala.1981).
Lastly, it is most interesting to note that the majority now reverses its position as to the result in this case by affirming the conditional order of the trial judge granting a new trial. Our rules, as well as the federal rules, clearly point out that when a judgment notwithstanding the verdict is granted and a new trial conditionally ordered, the appellate court has inherent authority to reverse the order granting a new trial and reinstating the jury verdict. See, Rule 50(c)(1), ARCP, and Rule 50(c)(1), FRCP. The weight of authority in considering whether to affirm the conditional grant of a new trial or reinstate a jury verdict must be viewed as what the federal courts have held in the case of Lind v. Schenley Industries, Inc., 278 F.2d 79 (3rd Cir.), cert. denied, 364 U.S. 835, 81 S.Ct. 58, 5 L.Ed.2d 60 (1960), and O'Neil v. W. R. Grace & Co., 410 F.2d 908 (5th Cir. 1969). In other words, it has been held that where "`no undesirable or pernicious element has occurred or been introduced into the trial,' and that [where] no useful purpose could be served by submitting the same evidence to another jury," O'Neil v. W. R. Grace & Co., 410 F.2d at 915, it is appropriate, then, to reverse the conditional grant of a new trial and direct that the judgment on the verdict be reinstated. In this case, I doubt that any purpose is served by a retrial of this case, assuming that the majority in this case is correct in holding that the trial court correctly allowed the case to go to the jury. We may be fortunate, however, because a new trial may more fully develop the real issues arising out of this newly found tort.
There is great concern on the part of the minority in recognizing the tort of bad faith based upon the facts in this case. Perhaps this concern would not be as great if it could be observed that this case is sui generis. In the future, it will be interesting to follow the impact of the majority's views on the contractual relationships between insurers and their insureds.
MADDOX, J., concurs.
ALMON, Justice (dissenting).
As Alice said, "Dear, dear! How queer everything is today! And yesterday things went on just as usual. I wonder if I've changed in the night."
See the dissenting opinion in Fletcher v. Tuscaloosa Federal Savings & Loan Ass'n, 294 Ala. 173, 314 So.2d 51 (1975). This new Wonderland created by the Court today finds me as bewildered as Alice. The wise cry of the jurist of yesteryear, "Out of the facts the law arises," seems faint. O temporal O mores!
The Court is so anxious to create a new tort that it cannot await the proper set of facts. For another example see American Road Service Co. v. Inmon, 394 So.2d 361 (Ala.1980). Somewhere out there on the juridical horizon looms a Dr. Frankenstein's monster, created in the Supreme Court's laboratory with only an empty test tube, *15 called Mr. Outrageous. No one is quite sure just what or who he is, but he is out there somewhere. Today the Court, with equal zeal, ardor, and with iron determination, introduces you to Mr. Bad Faith.
Setting aside for the moment the facts, or I should say the lack of facts, in this case and my personal views on the tort of bad faith, I have serious questions concerning the majority's opinion. According to the test adopted by the majority, "an actionable tort arises for an insurer's intentional refusal to settle a direct claim where there is either `(1) no lawful basis for the refusal coupled with actual knowledge of that fact or (2) intentional failure to determine whether or not there was any lawful basis for such refusal.'" The majority fails, however, to establish the parameters of this tort by not defining what constitutes a "lawful basis." The only guidance as to this basis is provided in Justice Embry's dissent in Vincent v. Blue Cross-Blue Shield of Alabama, Inc., 373 So.2d 1054 (Ala.1979), wherein he stated:
In Rex Insurance Co. v. Baldwin, 163 Ind.App. 308, 323 N.E.2d 270 (1975), the determinative factor was whether the insurer could in good faith dispute the claim. In Michael v. National Security Fire [&] Casualty Co., 458 F. Supp. 128 (N.D.Miss.1978), the test was held to be whether the insurer had a legitimate or arguable reason for failing to pay a claim. This language more closely comports with the type of intentional tort which I herein seek to define. Under the proper test, in my opinion, an insurer will not be held liable for an honest, but mistaken, belief that a legitimate basis exists for refusal to pay a claim. Any other approach would necessarily lead to inclusion of a negligence standard of conduct within the test for bad faith.
Accordingly, I would hold an actionable tort arises where an insurer intentionally refuses to pay a claim of its insured where there is either (1) no lawful basis for the refusal coupled with actual knowledge of that fact or (2) intentional failure to determine whether or not there was any lawful basis for such refusal.
Because of the nature of the test, it would be for the trial court to determine as a matter of law whether any lawful basis for the refusal existed. Should the court find a lawful basis for refusal existed, it would direct a verdict in favor of the insurer. Should the court find no lawful basis existed, it would be for the jury to determine whether the insurer had actual knowledge of its nonexistence. Whether the insurer intentionally failed to determine whether or not there existed a lawful basis for refusal would also be a question for the finder of fact. Under this test, an insurer would not be held liable for a mistaken but good faith belief that a lawful basis for refusal exists.
373 So.2d at 1067-68. Therefore, although not articulated by the majority, an insurer appears to have a lawful basis for refusing a claim whenever it has an honest but mistaken belief that a legitimate ground for refusal exists.
I also question the reach of the majority's opinion. Although couched in terms of an insurer's breach of its duty of good faith and fair dealing, the language of the opinion, as well as the authority relied upon to justify the recognition of the tort, is arguably broad enough to imply this duty in every contractual relationship.
I am compelled to conclude that the facts in this case do not "breathe life into the legal theories now advanced by the appellants." Lavoie v. Aetna Life and Casualty Co., 374 So.2d 310, 312 (Ala.1979). Neither of the two circumstances which the majority holds will give rise to an action for bad faith exists in this case.
The majority concludes that in order for National Security to have lawfully denied the Chaverses' claim without subjecting itself to a suit for bad faith, it would have needed to possess evidence implicating the mortgagees, the Chaverses, in the arson. Eden's testimony provided this inculpating evidence. While I will concede that Eden's character is not beyond reproach, his testimony nevertheless implicated Chavers in the suspected arson and, therefore, supplied *16 National Security with the "lawful basis" to deny the claim. Even the majority recognizes that "[t]he result of the [stress] analysis indicated that Eden was probably telling the truth ...." In addition to Eden's testimony, there were other facts and circumstances which, if they do not implicate Chavers, at least illustrate the very suspicious circumstances which surrounded the fire in the building. Three months prior to the fire, insurance coverage on the equipment and fixtures was increased from $20,000 to $35,000. Chavers was at least eight months in arrears with his monthly payments of $870.00 to Broadus, the individual from whom Chavers purchased the building. The foreclosure proceeding Broadus instituted against Chavers in July of 1975 was due to come to trial soon after the fire. Several hours before the fire Augsten refused to permit the police to search the building for a bomb which had been reported on the premises. And finally, Chavers left his home during the early morning hours prior to the fire. Based upon Eden's testimony, the circumstances and advice of counsel, National Security refused to pay the claim. Therefore, this is clearly not a situation where National Security had "no lawful basis for the refusal coupled with actual knowledge of that fact."
The majority found that National Security's failure to follow through with an investigation amounted to an "intentional failure to determine whether or not there was any lawful basis for such refusal." This finding is not supported by the evidence adduced at trial. The excerpts from the record on cross-examination of the insurer's claims manager do not show that National Security failed to investigatethey indicate that, even though the information was sought, National Security was unable to further develop any leads. This falls woefully short of an "intentional failure to determine whether or not there was any lawful basis" for refusing the claim.
Finally, it is important to note that, while not controlling, the trial judge granted National Security's motion for JNOV on the ground that the plaintiff failed to prove a prima facie case under Vincent, and that a "directed verdict for the Defendant should have been granted based upon the uncontroverted evidence that a reasonable basis for denying the Plaintiff's original claim existed when same was denied by the Defendant." Thus, it appears that the trial judge, in accordance with the guidelines proposed by Justice Embry in his dissent in Vincent, applied the proper rules and correctly decided National Security's motion.
All will agree that it is reprehensible for an insurer to intentionally and maliciously deny a valid claim simply for monetary gain. If a proper remedy could be fashioned which would deter this type of conduct only, without an unbridled overreach, then my concern would be considerably less.
The result reached in this case only serves to reinforce my belief that this Court should decline to recognize the tort of bad faith, especially as it is defined by the test adopted by the majority. This test, coupled with our scintilla of evidence rule, virtually precludes summary judgment for an insurer against whom a suit for bad faith has been instituted. It sends to trial, where the insurer is exposed to liability for both compensatory and punitive damages, those cases where the insurer has determined, either on advice of counsel or on the basis of all the circumstances, that the claim should be refused. It also denies an insurer, faced with circumstances which may or may not amount to a lawful basis for denying the claim, the right to make a business judgment to present the case to a jury and let them determine whether the insurer is obligated to pay the claim. Furthermore, the test necessitates a trial with the attendant exposure to liability for compensatory and punitive damages in those instances where, as in this case, the insurer endeavors to investigate what appeared to be a questionable claim.
EMBRY, Justice (dissenting):
After considerable reflection and rethinking, I have concluded that I can no longer remain with the majority and reverse the trial court for entering a judgment notwithstanding *17 the verdict in this case. I have reexamined the facts in this case and now think they fail to satisfy the tests I would require as enunciated in the dissent authored by me in Vincent. A determination by the trial court could not be made in this case that, as a matter of law, there was no lawful basis for the refusal to pay the Chaverses' claim. It is apparent to me that implicit in the entry of the judgment notwithstanding the verdict, is a determination by the trial court that, as a matter of law, there was a lawful basis for refusing to pay the claim.