This is an appeal by United States Fidelity Guaranty Company and Dawson Construction Co., Inc. from a judgment rendered in favor of Jacksonville State University in the amount of $165,842.95. We affirm.
Jacksonville State University (Jacksonville) decided to build a women's dormitory and in 1969 it employed the architectural firm of Hofferbert-Ellis and Associates, P.A. (architect) to prepare the plans and specifications for the building. On March 10, 1970, after taking bids for construction of the new dormitory, Jacksonville awarded the contract to Dawson Construction Company, Inc. (Dawson). That same day United States Fidelity Guaranty Company (USFG), as surety for Dawson, executed a performance bond to Jacksonville. Dawson then made a subcontract with the Bob Roberts Company, Inc. (Roberts) to install the aggregate panels on the outside walls of the dormitory and a subcontract with Copeland Glass Company (Copeland) to finish and install the windows and doors.
Among the provisions in the contract between Jacksonville and Dawson was the requirement that Dawson construct the building according to the "specifications" as promulgated by the architect. In his "specifications" the architect particularized the materials which were to be used in constructing the outside aggregate panels and the performance standards the panels should meet. The same particularization was made concerning the windows. According to these "specifications" the aggregate panels were to be composed of insulation board on exterior wall studs, lathing, epoxy or cementitious matrix, exposed aggregate to be embedded in matrix, sealer coat, caulking, zinc accessories, and related items. The architect also specified that the aggregate panels were to be waterproof.
Rather than giving a product name for the catalyzed cementitious or epoxy matrix, the architect listed the various properties the matrix should have. From the particular manner of listing the matrix' properties Roberts interpreted that specification to require a particular product, Boncoat, made by the MD Corporation.
The project was started in March or April of 1970. After the outside aggregate panels were installed on the dormitory, water began to come through the panels causing many of them to buckle away from the walls. Representatives for Boncoat and the architect met at the project site to discuss a solution to this problem and the manufacturing representative recommended that Roberts put a scratch coat of cement between the matrix material and the metal lath to solve the leakage problem. Apparently this did not prevent the leakage. It was also discovered that water was leaking around the windows installed by Copeland. Immediately thereafter at Dawson's request the window jambs next to the aggregate panels were recaulked, but this did not stop the leaks. There was also evidence of *Page 954 
corrosion on the metal portion of the windows and in the retainer channels. Although there was a leakage problem with the windows, the main source of leakage was from the aggregate panels. The record discloses that the leakage in the aggregate panels was a result of a defect in the Boncoat.
In May, 1971 Jacksonville began to insure the building and in June, 1971 the dormitory was occupied. It was not until December, 1972 that all the repairs were considered acceptable.
Sometime after December, 1972 the architect issued orders to Dawson concerning stains on the aggregate paneling. Thereafter, Dawson notified the architect that his guarantee period had expired but that he would forward the instructions to his subcontractors. In October, 1973 Jacksonville filed this action against USFG, Dawson and the architect to recover damages for breach of contract, against Dawson for breach of an implied warranty on account of defective window work and aggregate panels, and against the architect for breach of an implied warranty that the plans and specifications were sufficient to prevent water leakage. Before the action was tried, a settlement agreement containing certain conditions precedent was entered into between all the parties. This agreement was disregarded, however, and the action proceeded to trial. After a trial without a jury, the court found in favor of Jacksonville. It awarded damages against USFG and Dawson for $165,842.95 and against the architectural firm of Ellis and Cannon for $89,300.05. The defendants USFG and Dawson now appeal to this Court.
Among the issues raised by the appellants are these questions:
1. Whether the trial court construed the Jacksonville-Dawson contract erroneously.
2. Whether the apportionment of damages between Dawson and Ellis was supported by the facts.
3. Whether the settlement agreement between the parties released Dawson from the claims of Jacksonville.
4. Whether the damages awarded to Jacksonville were excessive.
The appellants argue that the judgment against Dawson and USFG arose from an erroneous interpretation of the contract by the trial court. Whether Dawson breached the contract depends upon its construction. The pertinent provision follows:
 That for and in consideration of the payments and agreements hereinafter mentioned, to be made and performed by the OWNER, the CONTRACTOR hereby agrees with the OWNER to commence and complete the construction . . . under the terms as stated in the General and Special Conditions of the Contract; and at his (its or their) own proper cost and expense to furnish all the materials, supplies, machinery equipment, tools, superintendence, labor, insurance, and other accessories and services necessary to complete the said project in accordance with the conditions and prices stated in the Proposal, the General Conditions, Supplemental General Conditions and Special Conditions of the Contract, the plans, which include all maps, plats, blue prints, and other drawings and printed or written explanatory matter thereof, the specifications and contract documents therefor as prepared by Hofferbert-Ellis and Associates, . . .
The relevant portions of the General Conditions are:
5. Materials, Services and Facilities
 (a) It is understood that except as otherwise specifically stated in the Contract Documents the Contractor shall provide and pay for all materials, . .
11. Contractor's Obligations
 The Contractor shall and will, in good workmanlike manner, do and perform all work and furnish all supplies and materials, machinery, equipment, facilities and means, except as herein otherwise expressly specified, necessary or proper to perform and complete all the work required by this contract, within the time herein specified, in accordance *Page 955 
with the provisions of this contract and said specifications and in accordance with the plans and drawings covered by this contract any and all supplemental plans and drawings, and in accordance with the directions of the Architect-Engineer as given from time to time during the progress of the work. . . .
34. Subcontracting
 (c) The Contractor shall be as fully responsible to the Owner for the acts and omissions of his subcontractors, and of persons either directly or indirectly employed by them, as he is for the acts and omissions of persons directly employed by him.
 (e) Nothing contained in this contract shall create any contractual relation between any subcontractor and the Owner.
41. Conflicting Conditions
 Any provisions in any of the Contract Documents which may be in conflict or inconsistent with any of the paragraphs in these General Conditions shall be void to the extent of such conflict or inconsistency.
The pertinent technical specifications under Part 2, Division 16b, the Exposed Aggregate Panels, and Division 9a, the Aluminum Window Walls, are:
DIVISION 16b
11. GUARANTEE
 a. All portions of the exposed aggregate panel installation, including necessary caulking, shall be done by one subcontractor and he shall be completely responsible for the entire installation.
 b. To insure against leaks, this subcontractor shall furnish a 3-year Indemnity Bond on the Exposed Aggregate Panel Installation, Guaranteeing panel installation to be completely watertight and free from any leakage, cracking or other defect in the work.
DIVISION 9a
15. GUARANTEE
 a. The window wall subcontractor (manufacturer, supplier and erector) shall furnish the Owner an indemnity bond equal to 10% of the subcontract price for work in this division. The indemnity bond shall be effective for a period of 3 years and shall guarantee the Owner against any form of leakage within the window wall system, windows, panels, and/or glass when such leakage is related to the installation from defective workmanship or materials. The effective date of the bond shall be the date of acceptance of the building for use by the Owner.
In reviewing contracts this Court seeks to accord them a reasonable construction under the terms used by the parties who made them, and when the contracts contain several provisions, all are construed together so that a harmonious operation can be given to each provision as far as the language used will permit. City of Fairhope v. Town of Daphne, 282 Ala. 51,208 So.2d 917 (1968). And while our Court will not re-make a contract between freely assenting parties, nevertheless we will recognize their right to express the limitations under which they will be bound when these are clearly manifested. NorwoodHospital v. Howton, 32 Ala. App. 375, 26 So.2d 427 (1946).
Under the terms of the contract under consideration, Dawson, the general contractor, was "to commence and complete the construction . . . under the terms as stated in the General and Special Conditions . . ." and to provide "at his . . own proper cost and expense . . . all the materials," etc. "in accordance with the conditions and prices stated in the Proposal, the General Conditions, Supplemental General Conditions and Special Conditions of the Contract. . . ." Under those General Conditions "the contractor shall and will . . . perform all work and furnish all supplies and materials . . . except as herein otherwise expressly specified. . . ." however, "the Contractor shall be as fully responsible to the Owner for the acts and omissions of his contractors . . . as he is for the acts and omissions of persons directly employed by him." The General Conditions further provide that "nothing contained in this contract shall *Page 956 
create any contractual relation between any subcontractor and the Owner." Notwithstanding the contract provisions which indicate that the general contractor may not be liable for acts and omissions of the subcontractor, nevertheless when we consider the other provisions of the contract with Section 34 (c), we believe that those provisions make the general contractor liable for acts and omissions of his subcontractors. Although the draftsmanship could have entailed more specificity with respect to the liability of the parties, the contract terms do not clearly exonerate the general contractor. Some of the contract provisions contemplate that someone other than Dawson might be looked to for some of the work and materials, but those do not necessarily exonerate the general contractor. The giving of a bond by a subcontractor in itself does not excuse the general contractor; the owner then has both the general contractor and the subcontractor to look to in the event of a breach by the subcontractor. The provision requiring that one subcontractor be "completely responsible" for the aggregate panel installation may refer only to the number of such subcontractors to be so employed, and does not necessarily exonerate the overall contractual responsibility of the general contractor.
It is also clear that Section 34 (c) makes the general contractor responsible not only for his own work but also for the workmanlike manner of the subcontractor's performance. We believe the more reasonable conclusion, therefore, is that the contract terms intended to make Dawson liable for deficiencies in materials and work furnished by Roberts and Copeland.
Dawson and USFG further insist that because the architect, in substance, specified Boncoat they should be exonerated from liability under the contract and they cite Wood-HopkinsContracting Co. v. Masonry Contractors, Inc., 235 So.2d 548
(Fla.App. 1970) and Fanning Doorley Construction Co., Inc. v.Geigy Chemical Corp., 305 F. Supp. 650 (D.R.I. 1969) for that proposition. From our examination of the record we conclude that appellants are correct in their assertion that the architect did, in substance, specify Boncoat. This is so because the record discloses testimony by Mr. Ellis, a member of the architectural firm, that the properties of the catalyzed cementitious or epoxy matrix listed under Division 16 (b) were copied from the Boncoat brochure. In addition, there is testimony that the architect approved the shop drawings submitted by Roberts which indicated the use of Boncoat. Thus the architect's copying of the matrix' properties into the "specifications" from the Boncoat brochure, coupled with the approval of the shop drawings indicating the use of Boncoat, were tantamount to the architect requiring Boncoat in his "specifications."
But neither Wood-Hopkins nor Geigy is authority for the proposition that merely because the architect did make a specification for Boncoat this exonerates Dawson from liability under the present contract. In Wood-Hopkins a brick masonry subcontractor brought an action against the general contractor for the balance due under their subcontract for brick installation. This subcontract was made pursuant to a general contract between the owner and the general contractor which required that the brick installed be only Miami Stone brick, a product made by a single manufacturer. But the Miami Stone brick installed by the subcontractor contained a latent defect which allowed water leakage. When the subcontractor refused to correct the defect the general contractor had the defect repaired and withheld payment to the subcontractor. The court, in holding that the subcontractor could recover the balance due him under the subcontract, stated that the subcontractor was not liable for the latent defect in the brick because the general contract apparently required that he use only Miami Stone brick. However, this case is distinguishable from the present controversy because there the action was between a general contractor and a subcontractor on their contract, whereas here the action is between the owner and the general contractor on their contract. And as we have pointed out in this action the question of liability deals with the contractual relationship *Page 957 
of the general contractor to the owner under the contract provisions which we have previously set forth.
The Geigy case, on the other hand, involved an action by the general contractor against the owner for the balance due under their industrial waste sewer system contract. Under that contract the general contractor was to install the underground sewer system using only Causplit Mortar to join the pipes together. However, the Causplit Mortar joints proved defective when water leaked through them. When the general contractor refused to repair the joints the owner had them repaired by another firm and withheld payment to the general contractor. The court held there that the general contractor could recover the balance due because it was not liable for defects in the Causplit Mortar, a product specifically required by their contract. But neither of these cases had contract provisions similar to the provision we have in Section 34 (c) which says that the general contractor shall be fully responsible to the owner for acts and omissions of his employees as well as for those of his subcontractors. Consequently, those provisions, when considered together, distinguish all the cases cited by appellants and make Dawson liable to Jacksonville for the materials and workmanship furnished by Dawson's subcontractors. Therefore appellants' argument is not well taken.
The appellants also argue that the apportionment of damages between Dawson and Ellis was unsupported by the facts. Although the record does not disclose any written finding of fact, when a trial court has heard testimony ore tenus this Court assumes that it made those findings which the evidence supports and which will justify the judgment rendered. Boaz Nursing Home,Inc. v. Recovery Inns of American, Inc., 289 Ala. 144,266 So.2d 588 (1972); Dockery v. Hamner, 281 Ala. 343,202 So.2d 550 (1967). Furthermore, when the evidence is heard orally before the trial court its verdict will not be disturbed on appeal unless plainly erroneous, a conclusion which this record will not allow us to entertain. Daugherty v. Gulf Shores Motel,Inc., 292 Ala. 252, 292 So.2d 454 (1974).
The final issue is whether the settlement agreement made between these parties (and others who are not parties here) prior to trial operated as a release of all claims by Jacksonville against Dawson. Among the provisions contained in that instrument was this one:
 3. Copeland Glass will recaulk the areas of the building necessary to prevent water from entering.
This language established a material condition precedent to any effective settlement between Dawson and Jacksonville, and that condition was not met because the record shows that the building continued to leak after the agreement was made, even though Copeland recaulked the windows on numerous occasions.Cf. Charter Corporation v. Lawrence Construction andDevelopment Co., Inc., 289 Ala. 300, 267 So.2d 147 (1972);Kingston v. Preston, 2 Doug. 689 (1773). Accordingly, because Dawson did not prove the performance of this material condition precedent, no error resulted from the trial court's disregard of the settlement agreement and its proceeding to trial on the merits.
Finally, the appellants argue that the damages awarded were excessive. However, the record discloses evidence that the damages awarded to Jacksonville were reasonably related to the amount necessary for Mr. Edward Roberts, a subsequent general contractor, to repair the defective dormitory windows and walls. In addition, the appellants in brief concede that the damages awarded actually equalled an estimate of repairs.
Because there is no reversible error the cause must be, and is, affirmed.
AFFIRMED.
TORBERT, C.J., and MADDOX, JONES and SHORES, JJ., concur. *Page 958