On January 25, 1988, Lehman and Debra Tucker, husband and wife, sued Insurall Insurance Agency and The Standard Plan, Inc., alleging breach of contract, negligent failure to provide insurance coverage, and bad faith refusal to pay an insurance claim.[1] On January 29, 1990, a jury returned a verdict in favor of the Tuckers. In a special verdict accompanied by answers to interrogatories, the jury found Insurall guilty of negligence and awarded the Tuckers $1,083.19 in damages; it also found against Standard Plan on the claim alleging breach of contract and bad faith failure to pay a claim and awarded the Tuckers $500,000 in punitive damages.
The trial court later reviewed the award of punitive damages against Standard Plan, as required by Hammond v. City ofGadsden, 493 So.2d 1374 (Ala. 1986); it upheld the award and entered a judgment consistent with the jury verdict against Insurall and Standard Plan. Insurall did not appeal. Standard Plan appealed the award of punitive damages against it for bad faith failure to pay. We affirm.
Insurall characterizes itself as an independent insurance agent. In addition to submitting insurance applications for its customers to various insurance companies, Insurall has the authority to issue temporary binders on behalf of several of the insurers. The Tuckers had been customers of Insurall continuously since 1984.[2] During *Page 1026 
that time Insurall had provided them with automobile insurance through several insurers. In April 1987, Randy Coker, the owner of Insurall, asked Debra Tucker to furnish him a Motor Vehicle Record Report (MVR) from the Alabama Department of Public Safety on her husband, because the insurance policy in effect for the Tuckers at that time would lapse on May 26, 1987, and he would need the MVR to apply for another policy. Among other things, an MVR lists all of a driver's accidents and traffic violations for the five years immediately prior to the date the MVR is issued.
In May 1987 Debra Tucker delivered to Insurall's office the MVR that Coker had requested. It was dated April 30, 1987, and showed the following: December 17, 1982, failure to stop at a stop sign; April 22, 1983, running a red light; April 2, 1984, running a red light; November 18, 1985, accident; December 14, 1985, accident; May 31, 1986, accident; February 12, 1987, speeding. However, neither Insurall nor the Tuckers applied for a renewal of the then existing insurance before it lapsed on May 26, 1987.
On July 1, 1987, Lehman Tucker was involved in an accident while he was driving his employer's truck. The Tuckers did not report this accident to Insurall. Lehman Tucker testified that he did not think that accidents in company trucks should be reported to his private insurer because the company insurer was responsible for such accidents and had covered the July 1, 1987, accident.
On July 6, 1987, Debra Tucker contacted Insurall and informed Katherina Bryant, an employee of Insurall, that the Tuckers needed to purchase automobile insurance. Bryant was well acquainted with the Tuckers and had handled their insurance matters since 1984. She testified that between 1985 and 1987 she had assisted the Tuckers in obtaining insurance coverage from other insurers and had completed insurance applications for them in the past. Bryant said that the Tuckers knew that she had been completing applications on their behalf and was signing Lehman Tucker's name to the applications, but the Tuckers disputed this testimony. Bryant also testified than she knew it was against Standard Plan's guidelines for the agent to sign the application for the applicant, but that Lehman Tucker knew that she was signing applications for him. Bryant testified that Lehman had had difficulty in obtaining affordable automobile insurance because of his poor driving record.
Bryant testified that she was the person who had completed the Standard Plan application for the Tuckers and that she had also signed Lehman Tucker's name to the application. On that application Bryant listed the following traffic violations for Lehman Tucker: (1) a speeding ticket on February 12, 1987, (2) an accident on May 31, 1986, (3) a "not at fault" accident on December 14, 1985, and (4) an accident on November 18, 1985. The list was based on the April 30, 1987, MVR that Debra Tucker had given Insurall. The application, however, failed to list the accident that Lehman Tucker had on July 1, 1987. The record indicates that Lehman Tucker was probably at fault in that accident.[3]
On July 8, 1987, Debra Tucker paid Bryant a premium of $434 and Bryant issued a binder on behalf of Standard Plan. Bryant testified that when Debra Tucker paid the premium she asked Debra if there were any other accidents that should be reported but that Debra answered "no." Debra, however, testified that she never discussed the Standard Plan application with Bryant. Both Lehman and Debra Tucker testified that they had never seen the application that Bryant completed and sent to Standard Plan.
Although Bryant completed the application and accepted the Tuckers' premium payment on July 8, 1987, she did not mail *Page 1027 
the application to Standard Plan until July 15, 1987. On July 13, 1987, Lehman Tucker was involved in another accident which he reported to Bryant on July 16, 1987. Bryant telephoned the claim to Standard Plan the same day. Standard Plan actually received the Tuckers' application for insurance on July 20, 1987, and ordered another MVR, which was issued on July 23, 1987.
On July 29, 1987, Standard Plan sent a letter to Lehman Tucker rejecting his application and rescinding the binder that Bryant had issued. In that letter Standard Plan stated that its reason for rescinding the policy was that the Tuckers had attempted to obtain insurance "through a material misrepresentation" because they had not listed the July 1, 1987, accident on the application. As a result, Standard Plan refused to honor Lehman Tucker's claim based on the July 13, 1987, accident. The Tuckers then sued Standard Plan and Insurall.
Standard Plan contends that the trial court erred in entering a judgment for the Tuckers on their bad faith claim. This Court first recognized an actionable tort for an insurer's bad faith refusal to pay a claim in Chavers v. National Security Fire Cas. Co., 405 So.2d 1 (Ala. 1981). The Chavers Court held that there was an implied-in-law duty of good faith and fair dealing in contractual relationships between insurers and their insureds. Bad faith was defined as "the intentional failure by the insurer to perform this duty implied in law." Id. at 5. The Court went on to hold:
 "[A]n actionable tort arises for an insurer's intentional refusal to settle a direct claim where there is either (1) no lawful basis for the refusal coupled with actual knowledge of that fact or (2) intentional failure to determine whether or not there was any lawful basis for such refusal."
Chavers, 405 So.2d at 7. In this case the Tuckers' bad faith claim rests on the second tier of the Chavers test, which was clarified in Gulf Atlantic Life Ins. Co. v. Barnes,405 So.2d 916, 924 (Ala. 1981):
 "The second tier of the test is an elaboration on the first. The trier of fact, by finding, on the part of the insurer, an intentional failure to determine whether or not there was any lawful basis for refusal, may use that fact as an element of proof that no lawful basis for refusal ever existed. The relevant question before the trier of fact would be whether a claim was properly investigated and whether the results of the investigation were subjected to a cognitive evaluation and review. Implicit in that test is the conclusion that the knowledge or reckless disregard of the lack of a legitimate or reasonable basis may be inferred and imputed to an insurance company when there is a reckless indifference to facts or to proof submitted by the insured."
The elements of a bad faith claim were summarized inNational Security Fire Cas. Co. v. Bowen, 417 So.2d 179, 183
(Ala. 1982), as follows:
 "An insurer is liable for its refusal to pay a direct claim when there is no lawful basis for the refusal coupled with actual knowledge of that fact. Chavers v. National Security Fire Ins. Co., 405 So.2d 1 (Ala. 1981). No lawful basis 'means that the insurer lacks a legitimate or arguable reason for failing to pay the claim.' Gulf Atlantic Life Ins. Co. v. Barnes, Ala., 405 So.2d 916
(1981). When a claim is 'fairly debatable,' the insurer is entitled to debate it, whether the debate concerns a matter of fact or law. Ibid.
 "Under those authorities the plaintiff in a 'bad faith refusal' case has the burden of proving:
 "(a) an insurance contract between the parties and a breach thereof by the defendant;
 "(b) an intentional refusal to pay the insured's claim;
 "(c) the absence of any reasonably legitimate or arguable reason for that refusal (the absence of a debatable reason);
 "(d) the insurer's actual knowledge of the absence of any legitimate or arguable reason;
 "(e) if the intentional failure to determine the existence of a lawful basis is relied upon, the plaintiff must prove the *Page 1028 
insurer's intentional failure to determine whether there is a legitimate or arguable reason to refuse to pay the claim.
 "In short, the plaintiff must go beyond the mere showing of nonpayment and prove a bad faith
nonpayment, a nonpayment without any reasonable ground for dispute. Or, stated differently, the plaintiff must show that the insurance company had no legal or factual defense to the insurance claim."
(Emphasis in original.) See also Thomas v. Principal FinancialGroup, 566 So.2d 735 (Ala. 1990).
Here, we must determine whether there was sufficient evidence to support the jury verdict of bad faith.[4] The strength of the jury verdict is based upon the right to trial by jury, White v.Fridge, 461 So.2d 793 (Ala. 1984), and a jury verdict is presumed to be correct. Alpine Bay Resorts, Inc. v. Wyatt,539 So.2d 160, 162 (Ala. 1988).
 "Upon review of a jury verdict, we presume that the verdict was correct; we review the tendencies of the evidence most favorably to the prevailing party; and we indulge such reasonable inferences as the jury was free to draw from the evidence. We will not overturn a jury verdict unless the evidence against the verdict is so much more credible and convincing to the mind than the evidence supporting the verdict that it clearly indicates that the jury's verdict was wrong and unjust."
Campbell v. Burns, 512 So.2d 1341, 1343 (Ala. 1987). (Citations omitted.) See also Ashbee v. Brock, 510 So.2d 214 (Ala. 1987);Jawad v. Granade, 497 So.2d 471 (Ala. 1986); and White, supra.
The Tuckers argue that Standard Plan was liable for bad faith refusal to pay because it did not investigate the July 1, 1987, accident to determine whether Lehman Tucker was at fault or whether he had attempted to intentionally mislead Standard Plan. The Tuckers say that without an investigation to determine whether the July 1, 1987, accident was an "at fault" accident, Standard Plan could not determine whether omitting it from the application was a material misrepresentation because, according to Standard Plan's underwriting guidelines, if the accident was not Lehman Tucker's fault, its omission would not be a material misrepresentation.
The record shows that had Standard Plan investigated the July 1, 1987, accident it would have discovered that Lehman Tucker was probably at fault. However, the second tier of theChavers test focuses on the information available to the insurer at the time the claim was denied. In other words, the insurer is not entitled to deny a claim in hopes that it can later develop evidence to support its denial. See, e.g., AetnaLife Ins. Co. v. LaVoie, 470 So.2d 1060 (Ala. 1984). Therefore, the fact that Lehman Tucker was probably at fault in the July 1, 1987, accident is irrelevant to our determination of whether there was sufficient evidence to support a jury verdict that Standard Plan intentionally failed to determine the existence of a lawful basis to deny the claim.
 THE INSURANCE CONTRACT
Standard Plan first argues that there was no insurance contract in this case because the omission of the July 1, 1987, accident in the application was a material misrepresentation of fact. Specifically, Standard Plan argues that because of this allegedly material misrepresentation in the application, there was never a meeting of the minds between the parties so as to create a contract. Standard Plan's argument rests on its assertion that Insurall was an independent insurance agency and that Standard Plan cannot be held accountable for any mistakes Insurall made in *Page 1029 
completing the Tuckers' application or for Insurall's failure to forward the application within a 72-hour period as required by Standard Plan's underwriting guidelines.
Both Insurall and Standard Plan characterize Insurall as an "independent agent." However, the existence and scope of an agency relationship are questions of fact to be determined by the jury. Potomac Leasing Co. v. Bulger, 531 So.2d 307 (Ala. 1988); Calvert v. Reciprocal Exchange Ins. Co., 523 So.2d 361
(Ala. 1988). All parties agree that Standard Plan had authorized Insurall to issue binders for immediate coverage to "qualified applicants" whose applications were postmarked no more than 72 hours after the application was signed. The underwriting guidelines that Standard Plan issued to Insurall set forth the criteria for Insurall to use in determining who was a "qualified applicant." The underwriting guidelines for issuing binders stated:
 "Coverage will be considered bound as of the date and time the application is signed, unless a later date is requested as long as the down payment check clears the bank. Otherwise, the application will be considered null and void. Applications will not be considered bound unless they are postmarked within 72 hours of the time the application is signed."
Under these guidelines, Insurall was required to mail any application to Standard Plan within 72 hours so that Standard Plan could evaluate the application and determine whether to issue a policy to the applicant. These guidelines also expressly stated that the agent and the applicant both must sign the application. The application itself, however, made no mention of a 72-hour forwarding requirement.
In Washington National Ins. Co. v. Strickland, 491 So.2d 872
(Ala. 1985), this Court discussed the standards that govern the liability of general agents, soliciting agents, and independent insurance agents. In that case, an applicant sued Washington National Insurance Company on fraud and misrepresentation claims based on alleged representations that an agent had made to the plaintiff. The insurer argued that it was not liable for the representations of the agent because he was an independent agent. This Court affirmed a judgment based on the jury verdict in favor of the applicant, holding that there was enough evidence to support a finding by the jury that the agent was a general or soliciting agent for the insurer. The Court spoke directly on the status of independent agents:
 "An independent agent or broker is usually not an agent for the insurer at all; rather, he is the agent of the insured. See Code 1975, § 27-7-1. For example, this Court has held that when an independent agent or broker fails in his duty to obtain insurance coverage, the principal may sue either for a breach of contract, or, in tort, for breach of duty imposed on the agent or broker to [use] reasonable skill, care and diligence in obtaining insurance.
". . . .
 "Although an independent agent or broker is normally an agent for the insured, for some purposes he may at the same time be an agent for the insurer as well. In such case if the insurer principal authorizes the agent to make representations, and the agent makes those representations within the scope of his authority to make them, the principal will be liable if those representations are false. In other words, an insurer's liability for the fraud of an independent agent or broker is predicated upon actual or apparent authority conferred upon the agent/broker by the insurer to make representations on the insurer's behalf. The doctrine of respondeat superior does not apply in the independent agent or broker situation because the insurance company does not exert sufficient control over the activities of the agent/broker to put him in the same position as a company employee. An independent agent or broker can never impose liability upon his principal for representations that are not authorized by the principal.
". . . . *Page 1030 
 "The issue is whether the jury could properly have found [the agent] to be a general or soliciting agent for Washington National so that Washington National would be liable for [the agent's] misrepresentations to [the plaintiff]."
491 So.2d at 872. (Citations omitted.) This case is likeWashington National Ins. Co.: Standard Plan's liability for the acts of Insurall depend upon whether there was enough evidence for the jury to properly find that Insurall was acting as a general agent for Standard Plan when it completed and forwarded the Tuckers' application.
In the evidence presented at trial was a booklet that Standard Plan had provided to Insurall. This booklet, addressed to "OUR ALABAMA AGENTS," contained information and guidelines regarding binders, rates, and the acceptability of risk. In addition, Coker, the owner of Insurall, had a license from American Security Insurance Company[5] to do business as its agent. This license was dated December 4, 1986, and stated, "Agent is not officially authorized to transact the business of insurance until license is in his or her possession." Furthermore, Bryant and Steven Klien, vice president of underwriting for Standard Plan, both testified that Insurall had the authority to issue binders for Standard Plan.
Viewing this evidence in a light most favorable to the prevailing party, as we must do, Campbell v. Burns,512 So.2d 1341 (Ala. 1987), we conclude that there was sufficient evidence from which the jury could reasonably find that Insurall was a general agent of Standard Plan and that Insurall had acted negligently in completing and forwarding the Tuckers' application. Consequently, Standard Plan can not now complain that the Tuckers made false representations on the application, because that application was completed, signed, and submitted by Insurall. See, Graham v. Equitable Life Assur. Soc. of theUnited States, 569 So.2d 355 (Ala. 1990); National Life Accident Ins. Co. v. Allen, 285 Ala. 551, 234 So.2d 567 (1970).
It follows that if Insurall was acting as a general agent for Standard Plan and was responsible for erroneously completing the application and for failing to forward it within 72 hours after the binder was issued, then Standard Plan was not entitled to rescind the binder on the basis of a material misrepresentation of fact in the application. See, Graham,supra; and National Life Accident Ins. Co, supra. Therefore, we hold that there was sufficient evidence to support a jury finding that there was a valid binder of insurance existing between the Tuckers and Standard Plan on July 13, 1987, when Lehman Tucker was involved in a motor vehicle accident.
 INVESTIGATION OF THE MISREPRESENTATION
Standard Plan also argues that it conducted an investigation by obtaining an MVR report on Lehman Tucker after it received his application on July 20, 1987. Based on this investigation, Standard Plan says, it discovered a misrepresentation of a material fact in that Lehman Tucker had not listed on the application the accident that had occurred on July 1, 1987. Therefore, Standard Plan contends that it had an arguable reason to deny Lehman Tucker's claim and to rescind the binder.
The Tuckers' bad faith claim is based on the allegation that Standard Plan failed to investigate whether Lehman Tucker was at fault in the July 1, 1987, accident and whether he had intended to deceive Standard Plan. The Standard Plan application stated that "[i]n the event the policy is issued, [Standard Plan] may declare the policy null and void if any of the answers are false and made with the intent to deceive and materially affect the risk which the company assumes by issuing the policy." (Emphasis added.) Therefore, any misrepresentation in the application must be material and made with the intent to deceive before Standard Plan could rescind the policy. UnitedStates Fidelity *Page 1031 Guaranty Co. v. Jacksonville State Univ., 357 So.2d 952 (Ala. 1978).[6]
In Aetna Life Ins. Co. v. LaVoie, 505 So.2d 1050 (Ala. 1987), and Continental Assurance Co. v. Kountz, 461 So.2d 802 (Ala. 1984), the Court recognized that an intentional failure on the part of an insurer to determine whether there was a lawful basis for denying a claim could be established by proof that the insurer either intentionally or recklessly failed to properly investigate the claim or to subject the results of the investigation to a cognitive evaluation and review. In Aetna, the Court stated: "considering the fact that the decision to deny [the claim] was made without the benefit of 'critical' sections of the medical file, the jury could find that the claim was not 'properly investigated,' and that there was a 'reckless indifference to the facts or to proof.' " Aetna,505 So.2d at 1053. See also, Thomas, supra; Blue Cross BlueShield of Alabama v. Granger, 461 So.2d 1320 (Ala. 1984), andCarter v. Old American Ins. Co., 544 So.2d 917 (Ala. 1989).
Likewise, if Standard Plan's decision to rescind the Tuckers' binder was made without the benefit of critical information needed to make such a determination, then the jury could reasonably find that Lehman Tucker's claim was not properly investigated and that Standard Plan exhibited a reckless indifference to the facts in evaluating the claim. The existence of bad faith must not be determined in a vacuum, but taking into account the particular circumstances existing at the time the insurer denied the claim. We hold that the evidence in this case was such that the jury could have reasonably found that Standard Plan either intentionally or recklessly failed to investigate the nature of the July 1, 1987, accident and whether Lehman Tucker had intended to deceive Standard Plan.
One criterion set out in the Standard Plan underwriting guidelines stated that anyone with three or more at-fault motor vehicle accidents within the previous two years was an unacceptable risk. The application Bryant prepared listed two at-fault accidents involving Lehman Tucker. Consequently, the determination of whether Lehman Tucker was at fault in the July 1, 1987, accident and whether he had intentionally tried to deceive Standard Plan regarding that accident would govern whether he was an unacceptable risk as defined by the Standard Plan underwriting guidelines.
An underwriter for Standard Plan testified that a number of criteria were considered before Standard Plan would determine whether an accident was not an at-fault accident. Such a determination of fault would usually be made by the agent after reviewing the accident report. According to this witness, if an application did not list an accident that is shown on an MVR, then Standard Plan automatically considered that accident to be an at-fault accident. This witness also testified that it was Standard Plan's usual business practice to rescind binders that had been issued to applicants if it was determined that they had failed to list an accident on the application.
When Standard Plan decided to rescind Lehman Tucker's binder on July 29, 1987, it had the following before it: an application dated July 8, 1987, but not mailed in by Insurall until July 15, 1987; the Tuckers' $434 premium payment; an MVR dated April 30, 1987, attached to the application (the information on that MVR matched the information in the application); Lehman Tucker's claim for the accident that had occurred on July 13, 1987, which had been reported by Insurall on July 16, 1987; and the July 23, 1987, MVR, which showed that Lehman Tucker had been involved in an accident on July 1, 1987, that was not reported in the application. The July 23, *Page 1032 
1987, MVR did not indicate who was at fault in any of the accidents.
Based on the above evidence, the jury could have reasonably found that Standard Plan intentionally or recklessly failed to subject the July 1, 1987, accident to a cognitive evaluation and review in order to avoid paying the claim that Lehman Tucker had filed on July 16, 1987. Therefore, we hold that there was sufficient evidence presented at trial to support a jury finding that Standard Plan had acted in bad faith in failing to investigate the claim.
 THE SPECIAL VERDICT
The trial court submitted the following special verdict form, pursuant to Rule 49(b), A.R.Civ.P., and the jury returned the answers indicated:
 "Question 1: Was the defendant Insurall Insurance guilty of negligence that proximately caused the plaintiff's damages?
 A. Yes: X No: ----- -----
 "Question 2: Is the defendant The Standard Plan, Inc. liable to the plaintiffs on the insurance contract?
 A. Yes: X No: ----- -----
 "Question 3: If answer to question No. 2 is 'yes', was the defendant The Standard Plan, Inc. guilty of bad faith?
 A. Yes: X No: ----- -----
 "Question 4: If the answer to question No. 3 is 'yes', what amount of punitive damages, and mental distress, if any, do you assess against the defendant The Standard Plan, Inc.?
One half million Dollars, ($500,000.00)
 "Question 5: If the answer to question No. 3 is 'yes', please state whether the defendant The Standard Plan, Inc. engaged in a pattern or practice of an intentional wrongful conduct.
 A. Yes: X No: "?[7]
----- -----
The record shows that Standard Plan did not object to the content or form of the special verdict. Therefore, Standard Plan has waived any objection it might have had as to the sufficiency of the questions propounded to the jury. Ford v.Canton, 530 So.2d 217, 223 (Ala. 1988). However, Standard Plan argues that the jury's answers to the special verdict are inconsistent because it found Insurall "negligent" and also found that Standard Plan had acted in "bad faith."
Standard Plan says that "[t]he negligence of the defendant Insurall which the jury found in the completion of the application for insurance precludes the initial formation of a contract between The Standard Plan and the plaintiffs because there could be no meeting of the minds. Contracts can not be negligently formed." We disagree with Standard Plan's analysis of the jury's answers to the special verdict in this case.
The jury found that Insurall had acted negligently in handling the Tuckers' application for insurance with Standard Plan. As we discussed above, there was sufficient evidence for the jury to find that Insurall was acting as a general agent for Standard Plan and that a valid contract of insurance existed between the Tuckers and Standard Plan, although Insurall acted negligently in completing and forwarding it. SeeWashington National Ins. Co., 491 So.2d at 872. Therefore, Standard Plan was not entitled to rescind its binder because Insurall negligently handled the Tuckers' application. Graham,569 So.2d at 355; National Life Accident Ins. Co.,234 So.2d at 567. Standard Plan's failure to investigate the issue of fault in the July 1, 1987, accident and failure to investigate whether Lehman Tucker had intentionally tried to deceive Standard Plan by not listing that accident in the application was an act separate from Insurall's negligence, and that failure to investigate gave rise to a distinct cause of action for bad faith refusal to pay a claim. *Page 1033 
 THE SAMPLE BINDER
Standard Plan also argues that the trial court erred in admitting into evidence a "sample binder," which read as follows:
 "The undersigned Company agrees to extend the following coverages as are indicated by the mark X as respects the described automobile for a period of 30 days from the effective date indicated, pending the issuance of an automobile insurance policy. This extension of insurance shall be in accordance with the terms of the Company's auto insurance policies and manual of rates and classifications applicable in the state on the effective date of this agreement. This agreement may be canceled by the Company by mailing written notice to the applicant stating when in accordance with any applicable statutes or policy terms such cancellation shall be effective."
Standard Plan argues that this evidence was inadmissible because the "document had no relationship to this case but was introduced as a 'sample widely used by other insurance companies.' "[8] The Tuckers called Ronald Gaiser as an insurance expert. Gaiser testified as to the industry standard regarding binders. In conjunction with this testimony, the Tuckers' attorney offered into evidence a "sample binder," which Gaiser testified represented the industry standard regarding binders. The trial court admitted this "sample binder" into evidence over Standard Plan's objections.
The record reveals that the "sample binder" was offered as demonstrative evidence of the expert's opinion as to the industry standard regarding binders. Demonstrative evidence is admissible so long as the proper foundation is laid. See, e.g.,Griffin v. Gregory, 355 So.2d 691 (Ala. 1978). The admissibility of such evidence is within the trial court's discretion and, absent an abuse of that discretion, the trial court's decision will not be disturbed on appeal. Payne v.Jones, 284 Ala. 196, 224 So.2d 230 (1969). Standard Plan has not shown that the evidence was inadmissible or that it was prejudiced by the admission of this evidence. Therefore, we hold that there was no abuse of discretion on the part of the trial court.
 THE JURY INSTRUCTIONS
Standard Plan next argues that it was reversible error for the trial court to refuse to give certain jury charges requested by Standard Plan. In reviewing instructions to determine if they correctly set forth the applicable law, the Court must read and consider the charge as a whole. GraycoResources, Inc. v. Poole, 500 So.2d 1030 (Ala. 1986). The refusal of a requested written charge is not error where the trial court's oral charge covered the principles stated in the requested charge. Rule 51, A.R.Civ.P.; McGehee v. Harris,416 So.2d 729 (Ala. 1982). Standard Plan complains that the trial court refused to give six of its requested charges. The record reveals that five of those requested charges were adequately covered in the court's oral charges to the jury.
One of Standard Plan's requested charges that the trial court did not give would have instructed the jury that "whether an insurance company is justified in denying a claim under a policy must be judged by what was before it at the time the decision is made." At the close of the court's oral charge to the jury, Standard Plan's attorney made the following objection to the trial court's charge: *Page 1034 
"THE COURT: Defendant?
 "[Standard Plan's Lawyer]: I've got two things. Number one, I want to except to the charges that weren't given that we requested in the same way as [the plaintiff's lawyer]. Number two, I wish you would charge them on a quotient verdict."
Rule 51, A.R.Civ.P., states: "No party may assign as error the giving or failing to give a written instruction . . . unless he objects thereto before the jury retires to consider its verdict, stating the matter to which he objects and the grounds of his objection." This Court has held that the purpose of stating grounds for objection is to give the trial court the opportunity to correct the instructions and to avoid the waste of time from reversals that result from technical omissions or oversight. Crigler v. Salac, 438 So.2d 1375 (Ala. 1983);Gardner v. Dorsey, 331 So.2d 634 (Ala. 1976).
Based on the totality of the circumstances, we hold that Standard Plan's objection to the trial court's failure to give its requested jury charge was too general and did not meet the requirement of Rule 51. The record shows that Standard Plan submitted a total of 26 requested jury charges, many of which contained numerous subparts. Standard Plan's objection, quoted above, did not adequately inform the trial judge of any potential error or afford him an opportunity to correct any such error. See, e.g., Burnett v. Martin, 405 So.2d 23 (Ala. 1981); Wright v. Waters, 367 So.2d 960 (Ala. 1979). Compare with Grayco Resources, supra, where the objecting party adequately made the trial court aware of the grounds for its objection.
Standard Plan also argues that the imposition of punitive damages is unconstitutional. We find this argument to be without merit, based on our decision in Pacific Mutual LifeIns. Co. v. Haslip, 553 So.2d 537 (Ala. 1989), aff'd
___ U.S. ___, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991). The judgment of the trial court is therefore due to be affirmed.
AFFIRMED.
MADDOX, SHORES, ADAMS, HOUSTON, STEAGALL, KENNEDY and INGRAM, JJ., concur.
[1] The trial court entered a summary judgment in favor of Insurall on the bad faith count because Insurall is not an "insurer" under Ala. Code 1975, § 27-14-7. The Tuckers have not appealed as to that summary judgment.
[2] The record shows that the application in issue listed Lehman Tucker as the applicant. Debra Tucker was listed as the applicant's spouse and as an additional household operator of an automobile. "Lehman Tucker" is the only applicant's signature that appears on the application (although the parties agree that he did not personally sign it).
[3] The record contains the accident report for the July 1, 1987, accident involving Lehman Tucker. According to this report, Tucker was driving his employer's truck when he hit another vehicle from the rear. The accident report states that the prime circumstance contributing to the accident was that Tucker was "tailgating" the other vehicle (i.e., following too closely).
[4] In National Savings Life Ins. Co. v. Dutton, 419 So.2d 1357,1362 (Ala. 1982), we established the "directed verdict standard" for ordinary bad faith cases; by that standard the plaintiff must show that he is entitled to a directed verdict on the contract claim. In this case, however, Standard Plan has not raised an issue as to whether the plaintiffs were entitled to a directed verdict on their breach of contract claim. Nonetheless, this case clearly falls within the exception to the "directed verdict standard" because there is a dispute as to whether an insurance contract existed. See Thomas v.Principal Financial Group, 566 So.2d 735, 742 (Ala. 1990).
[5] In 1987 Standard Plan was a division of American Security Insurance Company.
[6] We note that in Alabama it is not required that a material misrepresentation have been made intentionally for that misrepresentation to provide a basis for the insurer to rescind the policy. National Sav. Life Ins. Co. v. Dutton,419 So.2d 1357 (Ala. 1982). However, we also recognize that the insurer may contractually limit its right to rescind a policy to material misrepresentations that the insured intentionally made. See, e.g., State Farm Fire Cas. Co. v. Oliver,854 F.2d 416 (11th Cir. 1988).
[7] Standard Plan does not raise the issue of whether there was sufficient evidence to support the finding of a pattern or practice of intentional wrongful conduct. However, we note that the record contains several letters sent to other Standard Plan applicants that were very similar to the one it sent to the Tuckers.
[8] In contrast, the record shows that the binder in the Standard Plan application read as follows;
 "I understand that the total premium shown on the reverse side of this application is based in part upon the assumption that the information that I have provided regarding my driving record, the designation of and information concerning other operators of the insured vehicle and their driving records, and the principal location of the insured vehicle, is accurate and complete. If [Standard Plan] determines that any of such information is inaccurate or incomplete, and if I am notified of any additional premium based on accurate and complete information, I agree to pay such additional premium according to the directions in such notice. BOUND: DATE __________ 19__ Time ___."